JŌHN A. FREANER *vs.* HENRY YINGLING, and JOSEPH
DOUGLAS and LEVI SANDERS, Trustees.

*Principal and Surety—Obligation of a Creditor to preserve the Securities held by Him for a debt, for the benefit of the Surety— Debtor and Creditor—Conduct by a Creditor in relation to the Securities he holds for the debt, that does not discharge the Surety.*

A surety, upon satisfying the debt for which he is bound, is entitled to the benefit of all securities, either of a legal or an equitable nature, which the creditor has, or could have enforced against the principal debtor and those claiming under him. The creditor is bound to preserve all such securities for the benefit and protection of the surety; and if he parts with any of them, or if the benefit of them be lost by his act, the surety will be exonerated to the extent to which he is prejudiced by the act of the creditor. And this right of the surety is the same, although he may not have known of the existence of the securities held by the creditor, or though taken subsequently to the date of the contract of suretyship.

A creditor cannot be compelled to resort in the first instance to the principal debtor, or to the securities which he holds for the debt, before proceeding against the surety; nor is there any positive duty incumbent on the creditor to prosecute measures of active diligence; mere delay on his part, in the absence of some special equity, unaccompanied by any valid contract for such delay, will not amount to laches, so as to discharge the surety.

Certain promissory notes, joint and several, signed by a debtor and his surety, were given to the creditor, and shortly thereafter, at his instance, a chattel mortgage was given by the debtor as additional security for the ultimate payment of the notes as they became due. The notes were transferred by endorsement, and with the exception of two, were discharged at maturity. Upon default of payment of these two, suits were instituted and judgments received against the principal debtor and the endorser; and the latter having satisfied the judgment, it was entered to his use. Prior to the recovery of the judgment against the mortgagor, he had disposed of the mortgaged goods, and received the proceeds of sale. Subsequently the endorser of the notes having become insolvent assigned all his property for the benefit of his creditors, to trustees, who having obtained possession of the notes which

were paid by their grantor, issued an attachment against the property of the surety on said notes, he being a non-resident, to satisfy the ssme. The surety thereupon filed a bill against the mortgagee and others, to restrain proceedings under the attachment, upon the ground that the mortgagee, holding the mortgage as security for the payment of the indebtedness therein mentioned, and with full knowledge of the inability, or failure of the principal debtor to pay the said two notes when they respectively fell due, stood by and saw and suffered him to sell and dispose of the mortgaged property, and permitted the same to be wasted and dissipated. HELD:

That the neglect of the mortgagee to possess himself of the goods embraced in the mortgage, and apply them to the payment of the debt, was not such conduct on his part as to release the complainant as the surety of the mortgagor and principal debtor, and an injunction to restrain the attachment proceedings should not issue.

APPEAL from the Circuit Court for Washington County, in Equity.

In September, 1857, the appellee, Henry Yingling, sold to McCauley & Miller his stock of dry goods in Hagerstown, for which he took their promissory notes, with a mortgage on the stock of goods to secure the payment of the notes    These notes were endorsed by Yingling, and transferred to Hallowell & Co., of Philadelphia, in payment of his indebtedness to them. In April, 1858, McCauley & Miller dissolved partnership, the latter purchasing the interest of the former, and continuing the business for some years. Being desirous to substitute other notes for those of McCauley & Miller, the latter applied to Yingling, who, at his request, arranged with Hallowell & Co., for such substitution. At first, the promissory notes of Miller, endorsed by the appellant, were sent to Hallowell & Co., but they were rejected and returned, with the request that Miller and the appellant should give their joint and several notes to Yingling, and that he should endorse them. This was done, and six notes so executed and endorsed were delivered to Hallowell & Co., and the notes of McCauley & Miller were

surrendered. A short time afterwards at the instance of Yingling, Miller, to secure the payment of his notes, as they respectively fell due, with interest, executed a mortgage of his stock in trade, consisting of dry goods then owned and kept for sale in his store-room in Hagerstown, or which might be kept for sale thereafter, together with the counters and store fixtures belonging to him. Four of the notes of Miller and Freaner were paid by Miller to Hallowell & Co., three of them with money received from the appellant, leaving unpaid the two notes which became due, one on the 1st of July, 1860, and the other on the 1st of January, 1861. Upon failure to pay these two notes, Hallowell & Co. sued Miller, and also Yingling as endorser. The appellant was a non-resident, living in California. Judgment was obtained against Miller, and Yingling confessed judgment 1st of January, 1863, paid it to Hallowell & Co., and had it entered to his use. Before that time, on the 29th of May, 1861, Miller had executed a bill of sale to Peter B. Small and others, conveying his stock of dry goods, and other personal property. Prior to the 12th of June, 1861, Miller, being indebted to Reigle, Moore & Co., of Philadelphia, shipped to them goods out of his store to the amount of over $1,400. It was in evidence that these goods were no part of the goods embraced in the mortgage from Miller to Yingling. Yingling was informed that this shipment of goods was taking place, but did not consider the goods in the store of Miller of sufficient value to go to the expense of foreclosing the mortgage. After doing business for nearly four years, with his stock of goods constantly changing by purchases and sales, Miller closed out his store in February, 1862, before Hallowell & Co. obtained judgment either against himself or Yingling. In April, 1870, Yingling conveyed all his property by deed of trust, for the benefit of his creditors, to the appellees Douglass and Sanders. They having obtained pos-

session by order of the Court, of the two notes which were paid by Yingling, issued an attachment against the property of the appellant, to satisfy the indebtedness to Yingling, and levied upon the appellant's interest in the estate of his father, recently deceased.

The appellant thereupon filed a bill against the appellees, to restrain proceedings under the attachment, upon the ground that the appellee Yingling, holding the mortgage as security for the payment of the indebtedness therein mentioned, and with full knowledge of the inability or failure of Miller, the principal debtor, to pay the aforesaid two notes when they respectively fell due, stood by and saw and suffered him to sell and dispose of the mortgaged property, and permitted the same to be wasted and dissipated. The injunction was issued. The appellees filed their answer and testimony was taken. After hearing, the Circuit Court (ALVEY, J.,) delivered the following opinion:

There seems to be some dispute or conflict in the testimony, as to some of the facts connected with the transactions involved in this case, but in the view that I have of the law applicable to it, those facts are not deemed very material. The main facts are few, and are free from all doubt or controversy.

Whether and to what extent the application of the principle invoked by the complainant may be affected by the fact that Yingling, immediately after the making of the notes, which were negotiable, and the taking of the mortgage, assigned them by the indorsement of the notes to Hallowell & Co., and was never again the holder of any of them, until recovery had against him as indorser of the two last of them, and payment of the judgment, I do not deem it necessary to determine. But laying all the facts connected with the indorsement of the notes, and the equitable assignment of the mortgage, out of the case, I shall treat it as if Yingling had continued to hold

the notes and mortgage, with all the duties and obligations imposed upon him, that attach to and grow out of the relation of creditor and surety; for considering the case in this the most favorable aspect to the complainant, I am decidedly of opinion that he has failed to show any sufficient ground for the relief sought at the hands of this Court.

The notes were made on the 6th of April, 1858, and the mortgage was given on the 17th of the same month. The mortgage refers to the notes, and was given as additional security for their ultimate payment as they became due. It formed, however, no part of the original transaction to which the complainant was a party, but was subsequently executed at the instance of Yingling himself, and as additional security for the notes, and therefore formed no inducement to the suretyship of the complainant.

It appears, that as some of the notes became due, the complainant remitted money for their payment, and it is not pretended that he ever applied or suggested to Yingling, before the filing of the present bill, to take from the possession of Miller the goods covered by the mortgage, and make them available for the liquidation of the debt. Indeed, from the relation that the complainant bore to the principal debtor, the latter being his brother-in-law, his manifest disposition to aid and assist him, and in view of the fact that he had himself provided for the payment of such of the notes as Miller was unable to take up as they fell due, it is more than doubtful whether he would have desired such a proceeding on the part of Yingling.

The goods have been disposed of by Miller, and he has received the proceeds of their sale, and if the complainant was not willing, or failed to become active, to prevent the disposition of the goods, he can hardly complain of the inactivity of Yingling. The fact of his being a non-

resident cannot be allowed to change or modify the relative duties and obligations of the parties. The law is a fixed rule, having no reference to such a fact. It would have been very competent to the complainant to have stipulated for diligence and activity on the part of Yingling, if he had desired it. But having failed to make that a condition of his undertaking, he must take the law as it would be applied in any other case between parties occupying the relation of creditor and surety. And that law has placed within his reach and control ample remedy for his protection, and if he has not availed himself of it, the consequences of his neglect should fall upon no other person than himself. Now, as to the law of this case, there can be no question but that, upon satisfying the debt for which he is bound, the surety is entitled to the benefit of all securities, either of a legal or an equitable nature, which the creditor has or could have enforced against the principal debtor and those claiming under him. Indeed, the creditor is bound to preserve all such securities for the benefit and protection of the surety; and if he parts with any of them, or if the benefit of them be lost by his act, the surety will be exonerated to the extent to which he is prejudiced by the act of the creditor. And this right of the surety is the same, although he may not have known of the existence of the securities held by the creditor, or though taken subsequently to the date of the contract of suretyship.

It is equally the unquestionable law that a creditor cannot be compelled to resort in the first instance to the principal debtor, or to the securities which he holds for the debt, before proceeding against the surety. (*Folliott vs. Ogden*, 1 *H. Blk.*, 123; *Wright vs. Simpson*, 6 *Ves.*, 714.) He is not deprived of his right to resort to the surety, says Burge, (on Suretyship, 324,) upon his personal security, because there has been provided a fund for the debt of the principal to which the creditor might have

recourse for payment, but when the surety has paid the debt of the principal to the creditor, the surety may compel the creditor to proceed against the fund or pledge for his benefit. Nor is there any positive duty incumbent on the creditor to prosecute measures of active diligence; mere delay, therefore, on the part of the creditor, in the absence of some special equity, unaccompanied by any valid contract for such delay, will not amount to laches, so as to discharge the surety. (1 *Story Eq. Ju.*, sec. 326; *Wright vs. Simpson*, 6 *Ves.*, 734; *McLemore vs. Powell*, 12 *Wheat.*, 554.) The surety, if he desires to expedite payment, is entitled to pay the debt the moment it becomes due, and by that means put himself in the place of the creditor by substitution; or he may call upon the creditor, by the aid of a Court of Equity, to proceed against the debtor upon giving the proper indemnity against costs and delay. It is thus that the surety can protect himself against the delay and procrastination of both creditor and debtor. The specific question in this case is, whether the neglect of Yingling to possess himself of the goods embraced in the mortgage, and apply them to the payment of the debt, was such conduct on his part as to release the complainant as the surety of Miller, the mortgagor and principal debtor? By the neglect or omission to take the goods from the possession of Miller, he was enabled to dispose of them, and having disposed of them, he failed to apply the proceeds to the payment of the debt, to the exoneration of the complainant, as he was in duty bound to do. Who now, as matters have eventuated, should be required to bear the consequences of Miller's default and dereliction?

It is contended, on behalf of the complainant, that Yingling was chargeable with the safe preservation of the goods mortgaged, as by law the right of possession was devolved on him under the mortgage; and that, after default in the payment of the notes, it was his duty to

take possession of the goods and convert them into money for the payment of the debt.

But to this general proposition I cannot accede. Whatever may have been the strict right of Yingling in a Court of Law, in the contemplation of a Court of Equity, and according to the understanding and intent of the parties, as manifested by the nature of the transaction, the mortgage was but a security for the debt, and Miller, notwithstanding his default, remained the substantial owner of the goods. To have taken them out of his possession without his consent, would have required legal process, and this would have involved trouble and expense to Yingling. Not only the trouble and expense of taking the goods by replevin would have been incurred, but Yingling would have been compelled to prosecute the further measure of active diligence of converting the goods into money; for to have retained them for an indefinite time, and allowed them to have depreciated or become ruined, would have been alike unjust to both Miller and the complainant.

If, then, Yingling could not have been required to prosecute suit against Miller for the recovery of his debt, before resorting to the surety, and his delay and refusal to do so, notwithstanding Miller may have become insolvent, and the opportunity of collecting the debt from him lost by reason of the delay, would not discharge the surety, upon what principle is it that he could have been required to take the proceedings and incur the expense for the recovery and conversion of the goods into money? In the absence of some stipulation to that effect, I know of no principle that would require such proceeding at the hands of the creditor for the benefit of the surety.

This is in no respect like the case where the debtor places funds or securities in the hands and possession of his creditor to secure a debt for which a surety is bound, and which funds or securities, by some positive act or gross

Freaner *vs.* Yingling, *et al.* ·

negligence of the creditor, are lost or destroyed to the prejudice of the surety. If, in such case, the creditor surrenders or abandons the fund or security, or, in case of the security consisting of perishable property, he allows it to be taken out of his possession and destroyed, or for the want of ordinary care and attention he suffers it to perish and become worthless in his hands, then, it is clear upon the plainest principles of justice, whatever loss is sustained should fall upon the creditor rather than the surety. The case of *Baker vs. Briggs*, 8 *Pick.*, 122, is an instance of this class. But here Yingling never had the possession or control of the goods, and never stood in any such relation to them as bailee. They were in the hands and under the control of Miller, where, by the very contract of suretyship, they were intended to be placed, and that too, for sale and disposition by him. That Yingling was aware of the fact that Miller was disposing of the goods after the notes became due, is, I think, wholly immaterial, unless it were shown that they were in fact disposed of by his authority or with his consent. Mere quiescence or passiveness of the creditor, in the absence of a stipulation for active diligence in the contract of suretyship, will not discharge the surety. "The surety," says Ld. Eldon, (*Eyre vs. Everett*, 2 *Russ*, 381,) "has no right to say that he is discharged from the debt which he has engaged to pay, together with the principal, if all that he rests upon is the *passive conduct* of the creditor in not suing. He must himself use diligence, and take such effectual means as will enable him to call on the creditor either to sue or to give him, the surety, the means of suing." And to the same effect are the observations of that same learned Chancellor in the case of *Wright vs. Simpson*, 6 *Ves.*, 734. He there asserted that he never understood that, as between the creditor and the surety, there was an obligation of active diligence against the principal. The surety is guarantor, and it is *his* business to see whether the principal pays, and not that of the creditor.

Freaner *vs.* Yingling, *et al.*

In the case of the *United States vs. Simpson*, 3 *Penna. Rep., (Penrose & Watts)* 437, Ch. Justice GIBSON said, in reference to this question of the discharge of the surety, "That a loss from indulgence, which is purely permissive, will discharge a surety, is unsupported by authority, and in contradiction of the most obvious principles of justice—such a loss being attributable to the surety's own negligence in omitting to warn the creditor to proceed, without which he may not know that a loss is impending. Actual detriment is not the criterion or a material ingredient. If the creditor has disabled himself, the surety is *ipso facto* discharged; if he has not, no eventual loss from mere delay will produce that effect." That was a case where, by the omission of the creditor to revive a judgment by *sci. fa.*, the land of the principal debtor was discharged from the judgment lien, and the land was afterwards sold in satisfaction of other claims; and notwithstanding such omission by the creditor and loss to the surety, the latter was still held responsible. This case was reaffirmed in *Mundorff vs. Singer*, 5 *Watts*, 172, and was followed in the cases of *The Farmers' Bank of Canton vs. Raynolds*, 13 *Ohio*, 84; *Pickens vs. Finney*, 12 *Sm. & M.*, 468; *McGee vs. Metcalf*, 12 *Sm. & M.*, 535. And the principle upon which these cases were decided finds apt illustrations in the cases of the *Adams Bank vs. Anthony*, 18 *Pick.*, 238, and *Lenox vs. Prout*, 3 *Wheat.*, 520.

In the case of *Schroeppel vs. Shaw*, 5 *Barb.*, 580, and 3 *Comst.*, 446, it was held that the delay of the creditor in proceeding upon a mortgage of a third person, given by the principal to the creditor as collateral security, did not discharge the surety, although it was plain that the mortgaged property might have been made effectual for the payment of the debt by the use of timely diligence by the creditor. And it was there broadly asserted that the creditor was not bound to take active measures to enforce securities placed in his hands by the principal debtor, and

that the surety would not be discharged by any degree of negligence or supineness short of actual misfeasance.

And in the case of *Lang vs. Brevard*, 3 *Strob. Eq.*, 59, following the case of *Hampton vs. Levy*, 1 *McCord, Ch.* 107, it was held that the omission or neglect of the creditor to record a mortgage given him as collateral security, whereby it was postponed to subsequent incumbrances, afforded the surety no defence to an action against him by the negligent creditor.

It is easily perceived that the cases just referred to maintain a principle very much broader than is required to determine this case against the complainant; and if they are at all sustainable as the fixed law of the land, it is clear the complainant has not even plausibility in his case.

The cases mainly relied on by the complainant are those of *Hayes vs. Ward*, 4 *John. Ch. Rep.*, 123; *Mayhew vs. Crickett*, 2 *Swanst.*, 193; *Williams vs. Price*, 1 *S. & S.*, 581; *Capel vs. Butler,* 2 *S. & S.*, 457, and *Law vs. The East India Co.*, 4 *Ves.*, 824.

As to the case of *Hayes vs. Ward*, it requires but a slight examination to determine that it has no application whatever to a case like the present. It was a case where all the parties resided in New Jersey, where the transaction involved took place, and where it was alleged that the loan for which the bond and mortgage were given as eventual security, was tainted with usury; and Chancellor Kent, after some general observations upon the principles of the civil law, and the remedy of discussion, as known and practised in that system, in favor of sureties, says expressly that he does not mean to lay down any general rule, but that he thought there were peculiar circumstances in that case to call for a continuation of the injunction upon the suit at law, until the defendant had pursued his remedy upon the mortgage.

"The defendant, W.," says the Chancellor, "has shown a distrust of the validity of the mortgage by his

demurrer, and by omitting to prosecute either the plaintiff or the defendant B. in New Jersey, where they all reside, and where no impediment to a suit appears to exist, and by prosecuting the plaintiff while on a temporary visit to New York. The defendant W. ought to be obliged, under such a just suspicion of his case, to try the validity of his mortgage at home, and not to compel the plaintiff to pay, and then turn over to him a pledge, which, if frail and insecure, has been rendered so by his own illegal act. I put this case entirely upon the ground of the allegation, to which no answer has been given, that the mortgage is infected with usury, and would be useless and void, if placed by substitution, in the hands of the surety. If this should happen to be the case, the plaintiff, on paying, might be deprived of all indemnity from his principal, by reason of the conduct of the creditor."

The case of *Hayes vs. Ward* is thus explained by the Chancellor himself, and, as an authority, it is of course to be confined to what was decided by it. And in regard to the English cases relied on by the complainant, it is enough to say of them, that they have no similarity to this case in point of fact; and in principle, they seem to be at variance with the leading American cases to which I have referred; and, without saying that they have been overruled, it is very apparent that they have not been much, if at all, followed by the decisions of the Courts of this country. Indeed, their irreconcilability to the American cases is made quite manifest in the note of the American editor to the leading case of *Rees vs. Berrington*, 3 *Lead. Cas. in Eq.*, 551 *to* 557; and I think it would be rather difficult to maintain their entire consistency with the case of *Sasscer vs. Young & Kemp*, 6 *Gill & John.*, 243. Suffice it to say, however, that they do not apply to the present case.

The case in 6 *Gill & John.*, 243, just referred to, while its facts are different from those of the present, I think,

on principle, is quite in accordance with the several American decisions to which I have referred, and is, equally with them, decidedly opposed to the application of the complainant. It is there determined that it is not the duty of the creditor to become active in the prosecution of remedies for the benefit of the surety, and that he may repose upon the faith of the security he has taken; and that if the surety desires active measures to be taken for his protection, or expense incurred to render property available for the satisfaction of the debt for which he is bound, he must either discharge the debt and thus entitle himself to substitution, or he must apply to a Court of Equity to have the creditor directed to proceed for his protection.

And in speaking of the position taken in that case by the surety, that it was the duty of the creditor to discharge incumbrances on the property seized under the execution, in order to make it available as a means of satisfying the judgment, the Court said that such position was altogether untenable.

The creditor being satisfied with the personal responsibility of the surety, it was alike the interest and the duty of the latter to see to making the land available. Such a doctrine as that contended for, say the Court, would compel a creditor to make an advance to improve a security, with which he is abundantly satisfied, for the sole purpose of relieving the surety from the precise risk he had assumed.

But assuming this to be a question of negligence on the part of Yingling, in omitting to take active measures for the recovery and conversion of the mortgaged goods, what degree of negligence on his part would be required to be shown in order to release the complainant as surety? I suppose that nothing short of that degree of negligence which would give rise to the implication of connivance and fraud would be sufficient. And in this case I certainly find no sufficient evidence to warrant any such conclusion.

Finding nothing in the case to justify the injunction, I shall dissolve it, and dismiss the bill with costs.

A decree was accordingly passed, dissolving the injunction previously granted, and dismissing the bill with costs.

From this decree the complainant appealed.

The cause was argued before BARTOL, C. J., BOWIE, BRENT and ROBINSON, J.

*Attorney General Syester*, for the appellant.

Where a creditor, without being bound to sue or issue execution on judgment, does sue and issue his *fi. fa.*, and under that *fi. fa.* a levy is actually made, the property or effects thus held becomes answerable for the debt, and the creditor is not at liberty to abandon the hold he has thus acquired—he cannot relinquish the property. And if he does relinquish, or abandon the lien, or suffers the property so taken and at his disposal, to be squandered, or appropriated to other and different purposes, the surety is exonorated. *Carpenter vs. Devon*, 6 *Alab.*, 718; *Perrine vs. Fireman's Ins. Co. of Mobile*, 22 *Alab.*, 575; *Sneed vs. White*, 3 *J. J. Mars.*, 525; *Givens vs. Briscoe*, 3 *J. J. Mars.*, 534; *Farmers' Bank of Canton vs Raynolds*, 13 *Ohio*, 84; *Bank vs. Fordyce*, 9 *Barr*, 275; *Talmage vs. Burlingame*, 9 *Barr*, 21; *Curren vs. Colbert*, 3 *Ga.*, 239; *Robeson vs. Roberts*, 20 *Ind.*, 155, and also the cases cited, 2 *Lead. Ca. Eq.*, pt. 2, *p.* 374, and also *Commonwealth vs. Haas*, 16 *S. & R.*, 252.

The reason for these decisions is not uniform, but all agree in this: That when the property of the debtor has passed by the means stated in the several cases under the control, *although not into the actual possession*, of the creditor, and he suffers the means of satisfaction thus acquired to pass from his hands without applying them to the discharge of the debt, the surety is exonerated. *Kuhns vs.*

*Westmoreland Bank,* 2 *Watts,* 136; *Commonwealth vs. Miller,* 8 *S. & R.,* 452.

The creditor having acquired by his own activity such relations and control over the property and effects of the principal debtor as to render the property available in payment of the debt, the surety is discharged by a *surrender or abandonment of the property.* And the conduct of Yingling was nothing less. The property was sold with his knowledge, and he surrendered it without objection.

The true nature of the creditor's obligations in this case are not derived from the contract, but from the *subsequent act of the parties themselves;* and the duties, obligations, and relations of the creditor are wholly distinct and different from those imposed upon him by his original contract. The distinction would seem to be clear on principle, and well sustained by authority. *Craythorne vs. Swinburne,* 14 *Ves.,* 160; *Hodgson vs. Shaw,* 3 *Mylne & Ke.,* 183; *Clagett, et al. vs. Salmon,* 5 *G. & J.,* 327; 2 *Am. L. Ca,* (*5th Ed.*) 401, 402.

The acceptance of the security by the creditor imposed on him the duty of preserving that security for the benefit of the surety. The moment he took it, he took that, in the preservation of which, others were interested, and was bound to act with due regard to the safety of the property, and is responsible for any loss "which might have been averted by a reasonable degree of effort or precaution." 2 *Am. L. Ca.* (*5th Ed.*) 402.

The mortgage contains no covenant that the mortgagee shall remain in possession one hour after it was executed and delivered. The right of property, and of possession were, by operation of law, and the act of the principal debtor, in the creditor alone. The debtor's possession was by the mere sufferance of the creditor—in whose hands he saw fit to leave the property which, under every conceivable view, belonged to the creditor. The mortgagor's possession could at any moment have been terminated—

he was tenant at will, in the strictest sense. *Jamison vs. Bruce*, 6 *G. & J.*, 72 ; *Evans & Iglehart vs. Merriken*, 8 *G. & J.*, 39.

The execution and record of the mortgage communicated to the creditor as complete and unquestionable dominion and control over the property as if it had been taken by him from the shelves and stored away in his own rooms. He was the absolute, unqualified owner, as much so as if the mortgagor had never held title to it, and the appellant was within the rule and principles laid down in the following cases : *Baker vs. Briggs*, 8 *Pick.*, 122 ; *Hayes vs. Ward*, 4 *John. Ch. R.*, 123 ; *Mayhew vs. Crickett*, 2 *Swanst.*, 193 ; *Williams vs. Price*, 1 *S. & S.*, 581 ; *Capel vs. Butler*, 2 *S. & S.* 547 ; *Law vs. East Ind. Co.*, 4 *Ves.*, 824.

It is not insisted that the creditor should have expended money or time in reducing the property to money. And there is not a particle of evidence tending to show that the debtor would either have refused his demand for the property at any time, for the goods themselves, or that he would have refused to have paid over to the creditor the proceeds derived from the sale. The creditor never demanded either the property or the money, although he knew the debtor was selling, and had the money *in his hands*. *Ramsey vs. The Westmoreland Bank*, 2 *Pa.*, 203.

In all cases where either the property and effects of the debtor have passed under the control, and are at the disposal of the creditor as specific security for the debt, or where he has accepted stocks, mortgages of third persons, bonds, &c., as collateral security, or where he has received as security collaterals not perfect at the time of delivery, but wanting in something to be performed by the creditor ; in each and all these cases the duties of the creditor are not passive, but active ; positive not negative. He is bound to see to it that they are not only preserved, but must proceed to render them effectual *and available for*

Freaner *vs.* Yingling, *et al.*

*the purposes intended:    Muirhead vs. Kirkpatrick*, 9 *Harris*, 237, 241 ; *Neff's Appeal*, 9  *W. & S.*, 36 ; *Slevin vs. Morrow*, 4  *Ind.*, 425 ; *Russel vs. Hester*, 10 *Alab.*, 536 ; *Williams vs. Price*, 1  *S. & S.*, 581; *Ramsey vs. Westmoreland Bank*, 2 *Penn.*, 203; *Goodloe vs. Clay*, 6 *B. Monroe*, 236 ; *Nexen vs. Lyell*, 5 *Hill*, 466 ; *Capel vs. Butler*, 2 *S. & S.*, 457; *Watson vs. Alcock*, 19 *Eng. L. and Eq.*, 64, 237 ; *Black River Bank vs. Page*, 44 *N. Y.*, 453; *Alcorn vs. The Commonwealth*, 66 *Penn.*, 172; *Wintersmith vs. Tabor*, 5 *Bush*, 105, (*Ky.*)

If the foregoing cases do not demonstrate that the taking of security by the creditor *ipso facto* imposes active duties upon him, they do establish the principle, that whether the creditor's duties are active or passive, is to. be determined by the nature and quality of the security taken, and which he holds in *trust for the surety;* (although not always in trust for the principal ;) and that in no case can the creditor remain passive, where active measures are necessary to render the security taken operative, effectual or available for the purposes intended.

*George W. Smith* and *Hy. Kyd Douglas*, for the appellees.

Conceding this to be a case involving the relation of creditor and surety, there is nothing in the evidence which looks like guilty connivance or positive negligence on the part of Yingling, in prejudice of the rights of the appellant.   No such charge is made in the bill.   In the absence of such evidence, the principle is well established that the taking of collateral security by the holder from the principal, does not discharge the surety.   *Burge on Suretyship*, 207 ; *U. S. vs. Hodge*, 6 *How.*, 279 ; *Sasscer vs. Young & Kemp*, 6 *Gill & J.*, 243.

Further, the authorities show that the mere delay of a creditor to call on the principal debtor for payment, will not discharge the surety ; that purely permissive indul-

gence, although such indulgence may taste of negligence, will not destroy the remedy of the creditor or discharge the surety; and that, indeed, however much the mere forbearance of a creditor toward the principal debtor may prejudice the surety, he will not be discharged thereby. The creditor is bound to good faith, but not to diligence, and his *laches* will not discharge the surety, unless it amounts to that gross negligence which is tantamount to fraud; and he is under no obligation in law to give notice of specific instances of embezzlement or misconduct on the part of the principal, for the purpose of putting the surety on his guard. Surely he is under no obligation of active diligence for the protection of the surety, so long as the surety himself remains inactive. *King vs. Baldwin,* 2 *John. Ch. Rep.,* 554; *Schroeppel vs. Shaw,* 3 *Coms.,* 446, *and 5th Barb.,* 580; *United States vs. Simpson,* 3 *Penn.,* 437, *(Penrose & Watts;) P. & F. W. R. R. Co. vs. Shaeffer,* 9 *P. F. Smith,* 350, (59 *Penn.;) U. S. vs. Kirkpatrick,* 9 *Wheat.,* 720; *McGehee vs. Gewin,* 25 *Ala.,* 176; *Sasscer vs. Young & Kemp,* 6 *Gill & J.,* 243.

The appellant seems to ignore the distinction taken by the Courts between the remedies which are conferred by law, and those which are derived from the acts of the parties. The prominent and well defined distinction recognized by all the authorities, is, that the surety will be discharged by acts of a creditor, which are of a positive, active character, but that mere passive indulgence, omission or delay, will not discharge him; and as the surety has the remedy in his own hands, this distinction is reasonable and liberal. *Rees vs. Berrington,* 3 *Lead. Cases in Eq.,* (3d *Ed.,)* 814, 840; *Hampton vs. Levy,* 1 *McC. Ch.,* 107; *Lang vs. Brevard,* 3 *Strobh. Eq.,* 59; *Sasscer vs. Young & Kemp,* 6 *Gill & J.,* 243.

· The bill on its face does not make out a case for relief, and the testimony does not sustain the bill. The mortgage set up by the appellant, was not part of the original

Freaner *vs.* Yingling, *et al.*

transaction between Miller, the appellant, and Yingling. It was entered into afterwards, at the suggestion of Hallowell & Co., to whom the notes had been assigned. The fact that Yingling transferred the notes by endorsement to Hallowell & Co., before the mortgage was given, and never again had them in possession, would be sufficient to defeat this action of the appellant. The testimony shows that after the execution of the mortgage, Yingling was never considered in the transaction. The four notes as they fell due were paid by Miller to Hallowell & Co., directly. Freaner furnished the money to pay three of them, and if any diligence were needed to secure him against further loss as surety, his eyes ought then to have been opened to the necessity of exercising it. He surely cannot complain that Yingling was not more alive to his interests than he was himself.

BY THE COURT:

In this case we concur in the views expressed by the Circuit Court in the very full and well considered opinion sent up with the record; and for the reasons therein expressed, and upon the authorities cited therein, the decree will be affirmed.

*Decree affirmed.*