## PHILIP BLUM *v.* ANNA M. K. APITZ.

*Execution of Mortgage—Mistake and Fraud—Estoppel of Mortgagor—As Against Assignee.*

A mortgage executed in connection with the sale of property to the mortgagor, *held* not to have been executed under false representations as to the nature of the instrument, so as to invalidate it as against an assignee of the mortgage for value and without notice, the mortgagor, though she did not read the instrument, being able to read and write, its execution taking place in the presence of her adult children, the parties dealing at arm's length, and she being told by the mortgagee's agent merely that it "belongs to the sale."                pp. 97-100

One about to execute an instrument cannot, by refraining from inquiry as to its nature, place herself in a better position than if she had made the inquiry.                          p. 100

The general rule, that the assignee of a mortgage takes subject to all the equities existing and defenses available between the mortgagor and the mortgagee at the time of the assignment, does not apply in favor of one who executed the mortgage without having read it or had it read to her, or taking other measures to ascertain its nature and contents.          p. 101

One who executes a mortgage without reading it or having it read, or otherwise informing herself of its nature, is estopped, as against an innocent assignee of the mortgage for value, to assert that it is invalid because of her ignorance of its nature.
p. 102

*Decided November 5th, 1925.*

Appeal from the Circuit Court of Baltimore City (Sol-ter, J.).

Proceeding by Philip Blum against Anna M. K. Apitz to foreclose a mortgage. From a decree setting aside the mortgage, on exceptions to a sale, for fraud in its procurement, said Blum appeals. Reversed.

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and WALSH, JJ.

*Harry O. Levin,* with whom was *Albert H. Blum* on the brief, for the appellant.

*Fendall Marbury,* with whom were *William H. Lawrence, and Massie, Marbury & Bernard* on the brief, for the appellee.

PARKE, J., delivered the opinion of the Court.

The appellee, Anne M. K. Apitz, a widow, owned a leasehold property in Baltimore, known as 2715 Hugo Avenue, where she lived with her unmarried daughter, Johanna Apitz, a school teacher. Her married son, Fred W. Apitz, was a pharmacist, who lived in another section of the city. Mrs. Apitz and her son desired, in October, 1923, to move into the country. She saw a newspaper advertisement of suburban homes for sale by the Allied Construction Company, and, as a result of her inquiry and request, a salesman of that company, Louis J. Samuels, took her and her son on several occasions to see houses in Mt. Washington and Pikesville, which she could not afford to purchase; but, finally, she was shown an improved leasehold property at 5437 Bland Avenue, which she decided to buy for $5,200. Her son desired to buy an adjacent house, but he had no means. The mother had no resources other than her equity of redemption in her home at 2715 Hugo Avenue, which was subject to two outstanding building association mortgages in the original principal amounts of $2,500 and $500, respectively. It was estimated that the Hugo Avenue property was worth $5,500, and its sale would net $2,000 over the mortgage liens, and the value of this equity of redemption afforded the basis for negotiations, which resulted in the construction company agreeing to sell 5437 Bland Avenue to Mrs. Apitz and to enter into a conditional rental contract of sale with the son for a similar leasehold property. The contracts of the son and of the mother were signed on

the night of October 29th, 1923, at the home of Mrs. Apitz. Her contract of purchase was simple in form, and set forth the contract price of $5,200, acknowledged the receipt of $2,000 as having been paid on account thereof "prior to the signing" of the contract, although no money, but a mortgage for that amount, passed from Mrs. Apitz to the vendor; and provided that the residue of $3,200 was to be financed by the vendor, and that, upon payment as above of the unpaid purchase money, a deed for the property should be executed, at the vendor's expense, by the vendor, conveying the property by a good and merchantable title, with an adjustment of taxes, ground rent and other charges to the date of settlement, which was not specified in the contract.

The appellee conceded that there was no fraud in the making of this contract, and none was shown. But immediately after the contract was signed and, as a part of the transaction, Mrs. Apitz gave to the Allied Construction Company a third mortgage for $2,000 on her Hugo Avenue property, payable sixty days after date. On November 1st, 1923, the Allied Construction Company assigned this mortgage, for value and before maturity, to Philip Blum, the appellant, with the personal guaranty of Morris Myerhoff, the vendor's president, and of Joseph Myerhoff, its attorney. On the proof Blum is an assignee for value and without notice of the alleged fraud in the obtention of the mortgage from Mrs. Apitz.

About two weeks after the contract of sale, Mrs. Apitz concluded that she did not want the property because it was located too far from street car lines, and she notified the construction company that she would "cancel" the contract. The son, likewise, and for the same reason, repudiated his contract. The company did not agree to a cancellation and, after Mrs. Apitz was notified, on March 11th, 1924, by the assignee, of her default under the mortgage and of his purpose to foreclose, she employed Mr. Gunther, an attorney, who advised her to take the property, and so save the two thousand dollars she had invested in it by reason of the

execution of the mortgage. The Bland Avenue property which Mrs. Apitz had bought was subject to mortgage liens. which were about equal to the residue of the purchase money owing by Mrs. Apitz, and the testimony is that the vendor was in a position to complete the contract of sale so late, at the least, as the period from February 28th, 1924, to April 10th, 1924, during which the vendor's affairs were being administered by a committee of creditors. Mrs. Apitz, however, had determined that she did not want the property, and her early decision to repudiate the contract was not influenced by any doubt of the ability of the vendor to convey, or by any lack of diligence on its part in endeavoring to close the transaction. At no stage of the proceedings did Mrs. Apitz make an effort to secure her title. As a matter of fact, in December, 1923, she began negotiations to buy another property of another owner, and closed the purchase in March, 1924. The ultimate result of this repudiation of her contract was a sale, after May 15th, 1924, of the property in question by the trustees in bankruptcy of the vendor. The leasehold property was sold as one of a group of similar properties, and the amount realized was insufficient to pay off the mortgaged indebtedness.

The assignee, Blum, instituted foreclosure proceedings and sold to James H. Harris the Hugo Avenue property at public sale on November 28th, 1924, for $2,500, subject to the two prior mortgages on which $1,939.78 was due at the time of the sale. On December 26th, 1924, Mrs. Apitz, the appellee, filed her exceptions to the ratification of the sale, and, after testimony taken in open court, the sale was not ratified, but the mortgage was set aside on the ground of its having been obtained by the fraud of the Allied Construction Company at the time of its execution. The present appeal brings before us for review the correctness of the decree, which should not be disturbed on appeal unless the finding of the chancellor on the issue of fact is clearly opposed to the weight of the evidence when considered in relation to the controlling equitable principles governing the instant cause.

It is not controverted that the vendee was bound by an enforceable contract to buy the property for $5,200, and forthwith to pay in cash the sum of $2,000, and that the contract acknowledged that the sum of $2,000 had been paid before the signing of the contract, although in fact no money had then passed. It is further conceded that this credit of $2,000 was to be realized out of the proceeds of sale of the vendee's Hugo Avenue property, which was to be sold and converted for that purpose by the vendor. But here the points of agreement cease. The assignee asserted that the mortgage was given to secure the payment of this sum of $2,000, which the vendor had acknowledged to have received in the delivery to it of the mortgage. The vendee, while admitting the execution of the mortgage, denied that she knew its nature and maintained it was obtained through fraud practiced upon her. The record is rather unusual in that the principal contract is not questioned, but the manner of the performance by the vendee of her obligation to pay $2,000 is assailed as fraudulent. In other words, the vendee's position is that she was bound to pay $2,000 in cash, and that she was bound to raise that amount by letting the vendor make sale of her Hugo Avenue property for that purpose, but that through fraud she was duped into executing a mortgage on the Hugo Avenue property to secure to the vendor the payment of the sum of $2.000.

The mortgage was executed under these circumstances. The vendor had the contracts of sale between it and the mother and son, and the mortgage on the Hugo Avenue property to it from the mother for $2,000, prepared from information in their possession and obtained in the course of the negotiations, and arranged with the son for the meeting at the mother's home. The son notified his mother of the engagement, and Louis Samuels, the salesman and notary, and Jacob Myerhoff, the vice-president of the vendor, called for the son at his home, and the son and his wife went with Samuels and Myerhoff to the residence of Mrs. Apitz, where they found her and her daughter, Johanna Apitz, waiting.

The six then seated themselves about an oblong table, preparatory to the execution of the papers, which had not been before submitted to the purchasers. The following quotation from the testimony of Mrs. Apitz will give her version of what took place about the table. "Mr. Samuels and Mr. Myerhoff came in the evening on the date of the contract. Mr. Myerhoff told me if I wanted this house and I should sign the contract, and what I had to pay on it, and I said I had no money to pay on it but if they would sell by (my) Hugo Avenue house, probably there would be $2,000 left, and we could pay that on the house, and he said, 'All right, we will sell your house for you, and we will take that then,' so they must have marked that in the contract because when I read the contract, it said, 'Paid $2,000,' and I was so surprised, I said, I have not paid you $2,000. He said, 'That is all right. That means the $2,000 when you sell your house,' and after I had signed the paper he came around and put another paper there, and I did not pay any attention, and then he said, 'You sign this paper too.' I said, 'Why do I sign another paper? I just signed a contract.' He said, 'That belongs to the sale.' So I signed the other paper, too. That is all I know about the other paper." "Q. Well, now, had you talked prior to this evening to Mr. Samuels about the fact you did not have any money? A. Yes, and he said that would be all right, they would sell my house. They often sell houses like that and they would sell my house and take the money on the other house." She further testified that she did not read the second paper or mortgage nor was it read to her, and that she would not have executed the paper if she had known it was a mortgage, and that she did not discover it was a mortgage until March 11th, 1924, when she received a letter from the assignee notifying her that the mortgage was due.

The daughter, the son, and his wife, who were present all of the time at the execution of the papers, corroborated, with some minor conflicts in their narratives, the evidence of the mother. They are positive in their statements that the mort-

gage was not read by any one before its signing. In direct
conflict with all the material testimony of Mrs. Apitz and
her family in reference to the preparation of the mortgage
and its execution, is the evidence of Louis J. Samuels and
Jacob Myerhoff. These two witnesses swore that the con-
tracts of sale for the mother and for the son, and the mort-
gage deed conveying the Hugo Avenue premises to secure a
recited indebtedness of Mrs. Apitz of $2,000, payable in
sixty days, were drawn from information which was given
to the vendor's agents by the vendees two or three days be-
fore the papers were executed, and are the embodiment of
the terms of sale previously agreed upon by the vendor and
the mother and son in the course of the negotiations for the
sale of the two Bland Avenue houses. And they also stated
in effect, that all the papers, including the mortgage, were
read, before their execution at the table, to the vendees, who
understood their object and that the credit of the payment
of $2,000, which was given in the mother's contract of sale,
was represented by her indebtedness in a like amount to the
vendor under the mortgage simultaneously executed by her
with the contract of purchase, and that no concealment, arti-
fice, deceit, or duress was used to induce the parties to exe-
cute the paper writings mentioned. There is no denial that
the vendor gave Mrs. Apitz credit on their books for the
payment of $2,000 on the contract price; and that it sought
by an advertisement, which ran in "The Sun" for about a
month, to sell for her the Hugo Avenue house. It further
appears from the testimony of the assignee Blum and of the
auctioneer and real estate agent, Paul Caplan, that, a few
days after the contract of sale and before Blum took an as-
signment of the mortgage, he and Caplan went to examine
the Hugo Avenue premises to see if it were sufficient se-
curity for the third mortgage of $2,000, which he had been
asked to buy for $1,960. They saw Mrs. Apitz and made
an inspection of the property, and they testified that Blum
told her the object of his visit and that he understood she

had given a mortgage to the vendor for $2,000, and that the vendor wanted to assign the mortgage to him, and that she replied that she had given the mortgage, and that she and her son had purchased the houses of the vendor, and that as soon as she sold the Hugo Avenue house she would pay off the mortgage of $2,000. Mrs. Apitz denied that Caplan had visited her home, but said that Blum had called at the time he named and that she thought he was a prospective buyer, who had been sent to her by the Allied Construction Company, but that neither he nor she mentioned the mortgage of $2,000.

While the testimony on the part of Mrs. Apitz was that neither she, nor her son, nor her daughter, were experienced in business, yet the same testimony disclosed that she was a mature woman, who had bought her residence after she became a widow and had executed a mortgage on it on May 6th, 1920, to secure a loan of $2,500, and had obtained a second loan of $500 on June 3rd, 1921, which she had secured by a second mortgage on the same property. She was, therefore, acquainted with the form and manner of execution of a mortgage, and she was able to read and to write. A mere glance at the paper she signed would have informed her that it was a mortgage. She signed it, moreover, in the presence of her daughter-in-law, who was in her twenty-third year and who had been educated at school in Cumberland; of her daughter, who was twenty-three years old and who was a school teacher with four years of experience; and her son, who was twenty-five years of age and a pharmacist, and therefore, a man of at least some education and business experience. Under such circumstances, it would seem incredible that Mrs. Apitz and her family did not know that she was executing a mortgage, and we should not be inclined to agree with the conclusion that the appellee had met the burden of proof and had established fraud on the part of the agents of the vendor in procuring the execution of the mortgage without appellee's knowledge of its nature.

However, the decision of this case does not turn upon

the resolution of controverted facts, but, disregarding all the disputed testimony on the part of the appellant, must find its solution in the conduct of the appellee as disclosed by the evidence produced in her behalf.

At the time of the execution of the mortgage, Mrs. Apitz was supported by the presence of her daughter and her daughter-in-law, two intelligent young women, and that of her son, whom she had requested to be present to protect her interests. She was the widow of a minister, and understood English, which she spoke, read, and wrote. Both Samuels and Meyerhoff were comparative strangers, as she and her children had seen them but a few times before, and then only in connection with the business of the evening. The parties dealt at arm's length. Mrs. Apitz estimated that the time taken was about half an hour. It was toward the end of this period, after the contract of purchase had been signed, that the last paper writing was presented to her for her signature. Although her business experience was slight, she had executed on two previous occasions mortgages on the same property. And she testified on cross-examination that she knew that the writing was an important document. But she simply asked Meyerhoff: "Why do I sign another paper? I just signed a contract," and his reply was, "That," meaning the mortgage, "belongs to the sale"; and she signed forthwith without a request to see it, or to read it, or to have it read to her or for her, and without a single inquiry as to the tenor or nature or effect of the paper.

The reply that the paper writing "belonged to the sale" was not a representation of its contents, its effect and purport, nor was it a statement of the nature, class, character or description of the document. The question was not what the paper was, nor how it would operate, but merely why it should be executed. The answer neither informed nor misled as to the tenor of the paper writing and indicated no more than that the writing was an inseparable part of the business in hand. So far as the rejoinder went, it was correct, as the paper was an integral part of the transaction as conceived

by the vendor. The mortgage was a legitimate method of making real the recital of the contract that Mrs. Apitz had paid to the vendor the sum of $2,000 before the signing of the contract of sale, because the indebtedness created and secured by the mortgage made actual an otherwise illusory payment by Mrs. Apitz and, while it bound the vendor to the credit of $2,000, no matter what might be lost by the acceptance of the mortgage as a cash payment on the contract price, it likewise secured to the mortgagor a release on the payment of the mortgage indebtedness or, in default of that payment, the value of the equity of redemption, and obtained for her sixty days during which the amount of the mortgage could be raised through the contemplated private sale of the Hugo Avenue property.

Inasmuch as the answer did not indicate the character and tenor of the paper submitted, nor any specific reason for its execution, the answer must be held to be lacking in frankness and completeness, but the indefiniteness of the answer and its non-disclosures were so glaringly apparent to persons of ordinary intelligence, and so suggestive of further inquiry, that the words used could not operate as a deceit upon the appellee, who could have easily and at once found a complete answer and full protection by merely glancing at the paper she had not signed. Neglect to prosecute further inquiries and to read the paper writing were her own fault, as she admitted that she, her son, her daughter, and her daughter-in-law, all had an opportunity to see and to read the mortgage before she signed.

The paper writing was a familiar legal instrument, commonly used for the purpose of investment and subject to transfer by assignment. It was the duty of Mrs. Apitz as a matter of ordinary prudence on the part of persons under similar circumstances not to have executed this paper until she had availed herself of the fair opportunity afforded her to read it or have read it. She was put on inquiry and she must be held to know the facts which she could have ascertained, if she had but read. By refraining from in-

quiry, she cannot place herself in a better position than she would have been if she had made the inquiry. *London Joint Stock Bank v. Simmons* (1892), A. C. 201 (H. L.), at p. 220.

As stated by *Ewart on Estoppel,* at page 35, "It is your duty in executing a document to see that it is that which you believe it to be, for otherwise some third person may be led to believe that you have agreed to that which in reality you have not even considered." In failing to inform herself of the nature or contents of the document, which she voluntarily signed without reading or hearing read, the appellee, under the circumstances, failed in her duty to use "an appropriate measure of prudence" to avoid causing loss to another through an assignment which was a reasonable consequence of, and made possible by, her careless act. It was this disregard of duty which gave the mortgage currency and credibility and the mortgagee the opportunity afterwards to assign the mortgage as a valid document. The appellant was accordingly led to have faith in the validity of the mortgage and to change his position to his detriment by becoming the *bona fide* assignee, for value, and without notice, of the mortgage.

The conduct of the appellee has lost to her the benefit of the general rule that the assignee of a mortgage takes subject to all the equities existing and defenses available between the mortgagor and mortgagee at the time of the assignment, and has placed the assignee in a better position than that of the assignor.

In the appeal of the *Bank of Bristol v. B. & O. R. R. Co.,* 99 Md. 661, the rationale of this principle of estoppel is clearly stated and applied at page 681 : "The principle which lies at the root of this doctrine is a very familiar one. It is a general and just rule that when a loss has happened which must fall upon one of two innocent persons, it must be borne by him who has occasioned the loss, even without any positive fault committed by him, but more especially, if there has been any carelessness on his part which has caused or contributed to the misfortune. *Somes v. Brewer,* 2 Pick.

190. An illustration of the application of this doctrine is found in *Eversole v. Maull,* 50 Md. 95, and *Diaz v. Chickering,* 64 Md. 349. If the jury should believe that the bank acted in good faith in discounting the draft for DeCamp and accepting the bill of lading as collateral security, and if Atkins Brothers by putting it in the power of DeCamp to deal with the property as his own enabled him to mislead the bank, and if in consequence of their confidence in him and the credit of one day which they gave him a loss must fall either upon the bank or upon them, then, wholly aside from all questions respecting the negotiability of the bill of lading, the doctrine imposing the loss upon the persons by whose carelessness DeCamp was enabled to represent to the bank that the property was his, that loss thus occasioned by that representation, must fall upon them." *Hardy & Bros. v. Chesapeake Bank,* 51 Md. 590, 591; *Tubman v. Lowekamp,* 43 Md. 324; *Beaufort v. Nuld,* 12 Clark & Fin, 248, 286; *Ewart on Estoppel,* 434; *Phelps' Juridical Equity,* sec. 180, cases cited: *Williston on Contracts,* sec. 1488, p. 2649, sec. 1577.

Our conclusion is that on this record the appellee is estopped by her conduct, at the time of signing the mortgage, to deny its validity, and that the sale should have been ratified. This view renders it unnecessary to discuss the other objections which were raised below and which have been considered, but which do not affect the result.

> *Decree reversed, with costs to the appellant, and cause remanded for the passage of an order in conformity with this opinion.*