## LILLY GOLDEN *v.* KOVNER BUILDING & LOAN ASSOCIATION.

[No. 35, October Term, 1928.]

168

*Decided December 7th, 1928.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, DIGGES, PARKE, and SLOAN, JJ.

*Joseph Sherbow,* with whom were *E. Milton Altfeld* and *Allan Eli Cohan* on the brief, for the appellant.

*Joseph Fax,* for the appellee.

PARKE, J., delivered the opinion of the Court.

Lilly Golden instituted proceedings in equity on January 27th, 1927, against the Kovner Building and Loan Association of Baltimore City, for the purpose of obtaining a permanent injunction restraining the sale of her leasehold property in the foreclosure proceedings under a mortgage from Samuel Highkin, William Paper, and Lilly Golden, to the association. The plaintiff alleged that the inclusion of her property and her execution of the mortgage were obtained by fraud.

The testimony is that William Paper was the owner of a leasehold property known as No. 2130 East Lombard Street, and sold it to Sarah Miller for $6,000. Neither Mrs. Miller nor her husband could take title to the property, as there were judgments of record against her and the husband was in bankruptcy, so, for Mrs. Miller's benefit, it was arranged that her brother, Samuel Highkin, would take the title and borrow

the necessary money in his name, although the property was to be held for Mrs. Miller, and she was to pay the debts thus incurred. On the assumption that a loan of $4,000 could be obtained on a first mortgage lien, Highkin applied on October 8th, 1925, to the association for a loan of $2,000, to be secured by a second mortgage on the property bought and on plaintiff's leasehold property at No. 2203 East Lombard Street. The association appointed a committee to examine the properties and to report their valuation on each, but as Highkin had mistakenly given No. 2007 East Lombard Street as plaintiff's property, the committee only examined No. 2130 East Lombard Street and reported, on October 15th, 1925, that this property would be sufficient security for a second mortgage loan of $1,000. Highkin then submitted, as additional security for the loan applied for, the plaintiff's property, whose number he again incorrectly gave as No. 2209 East Lombard Street; and No. 2222 East Lombard Street, which he stated was owned by William Paper. The association's committee went upon the premises at No. 2222 East Lombard Street and met Mrs. Paper, who said that she owned the property and would not unite in the proposed mortgage. The committee found the plaintiff did not live on the premises named by Highkin, but, learning her residence from the neighbors, went to her property and examined it. As a result of their report, the association agreed to lend Highkin $2,000, to be secured by a second mortgage lien on the leasehold property to which he was taking title, and on the property of the plaintiff, with Paper signing the mortgage as a guarantor of the loan. The association then left the details of the transaction to their attorney, G. Joseph Walpert.

While these negotiations were proceeding, the original amount of the loan on the first mortgage lien was reduced to $3,500, and this made a difference of $500, which was agreed to be obtained by a loan made by the Pen Mar Permanent Building and Loan Association on five notes of $100 each to be given by Highkin, Paper, and plaintiff. On December 28th, 1925, the parties met at the office of Walpert, and the papers were signed and executed while Highkin, Paper, Mrs.

Miller and the plaintiff sat around a table, which was used for such purposes. When the transaction was completed, under the supervision of Walpert as attorney for the association, Paper had executed and delivered a deed granting the leasehold lot known as No. 2130 East Lombard Street to Highkin, who then had executed and delivered a first mortgage lien thereon to Concetta Glorioso for $3,500; and who, together with Paper and the plaintiff, and for the purpose of securing the loan of $2,000, had executed and delivered to the defendant a mortgage, which was a second lien on the property bought by Highkin for Mrs. Miller and a lien on the leasehold property of the plaintiff; and Highkin, Paper and the plaintiff had, also, made and passed five notes of $100 each to the Pen Mar Permanent Building & Loan Association. The consideration for these loans was $6,000, and the difference between this amount, and the purchase price and the fees, commissions, costs, and expenses, was then adjusted in a manner with which the court is not now concerned; and the matter was finished and the deeds and mortgages recorded. Mrs. Miller, the beneficiary of these negotiations, did not pay the obligations which Highkin and the others had assumed in her behalf, but which she had promised to discharge, and, because of her default, the association instituted proceedings to foreclose its mortgage on both properties.

The evidence on the record is conclusive that the association would not have made the mortgage loan to Highkin, if the plaintiff had not pledged her property, and that the transaction was in the routine of its business for the consideration set forth in the mortgage, and free of all fraud and misrepresentation on the part of the association, unless by these means its agent, the attorney Walpert, induced the plaintiff to unite in the mortgage in question.

The plaintiff's participation in the getting of the money for the purchase of the leasehold property was through her friendship for her neighbor, Mrs. Miller, who successfully solicited her financial aid, but who left the negotiations with the association to her brother, whose representation that the plaintiff would join in the mortgage for the purpose of pledg-

ing her property was accepted in good faith by the association. The plaintiff, therefore, had not been at any meeting of the association nor at its offices; nor had she had any personal contact with any of its executive officers, or any representative who had authority to lend, before she met Walpert at his law office on the day the papers were to be signed.

The evidence discloses that the original plan for raising the purchase money contemplated a first mortgage loan of $4,000, and when the mortgagee could only lend $3,500, there was a corresponding increase in the money to be otherwise secured. It was apparently then that the plaintiff was requested to increase the amount of the loan on notes for which she would be responsible jointly with Paper to $500, and the entire matter hung fire until she was persuaded by Mrs. Miller to consent. It was the plaintiff's testimony that this was all she ever consented to do; and in this she is supported by the evidence of Mrs. Miller, Highkin, and Paper. Their evidence, however, is neither consistent nor convincing. They were present when the mortgage in controversy was executed and acknowledged, and it is unbelievable that they would have kept silent and permitted the plaintiff not only to sign the notes for $500, but also to execute the mortgage which pledged her property, if this had not been the understanding. Indeed, none knew better than these three witnesses that the association would not grant the loan of $2,000 on the security of a mortgage which did not convey the plaintiff's leasehold estate. It was the association, and not Walpert, who prescribed, as an indispensable condition to the loan, that the plaintiff's leasehold property be embraced in the mortgage; and no one was produced who testified that Walpert made any misrepresentation to the plaintiff of the nature of the instrument which she signed and acknowledged, or practiced any deceit upon her. All that the plaintiff can charge against him is that, when she went to his office on the day of the settlement, he said to her: "Mrs. Golden, you come in to sign a note for Mrs. Miller." I said, "Yes." So he said, "All right, sit down." "I sat down on the chair and he handed me the papers, I signed, and that is all."

Walpert had never requested the plaintiff to sign either note or mortgage, but he did know that there had been a delay because it was necessary for the purchaser to get the plaintiff's consent to be bound for $500 on notes to the Pen Mar Permanent Building and Loan Association before the purchase price could be paid. So, his greeting to her was a natural inquiry about the only thing which, as he explained, had been a subject of some uncertainty on the part of the principal borrower. There was unquestionably no misrepresentation nor deceit practiced in asking such a question and placing before her in turn the mortgage deed for her signature and acknowledgment. The plaintiff signed the mortgage in Hebrew after Highkin's and Paper's signatures, and she, also, signed with them five promissory notes of $100 each to the Pen Mar Permanent Building Association. The plaintiff testified that she could neither read nor write English, but there is no evidence that Walpert knew that she could not read English, although her signature in Hebrew was an indication that she could not write English. The plaintiff is a widow, with five children, and she has been in this country more than fourteen years. At the taking of her testimony she had owned the premises mentioned in the mortgage for eight years, but the title had been in her brother-in-law until January 12th, 1923, when it was conveyed to her. She has her home and keeps a small grocery store in the property. Her testimony shows that she was in full possession of her wits, and it is incredible that she did not perceive and understand that there was a wide difference between the five notes she signed and the mortgage deed she executed. The form of these two legal instruments is characteristic; and would put any one on notice that they were not the same things. Yet she made no inquiry. Her statement that she did not know what she was signing because of her inability to read made it all the more imperative that she should disclose that fact and inform herself by investigation before she bound herself by an instrument prepared by an adverse party. She did none of these things during the half hour she was in Walpert's office. In the absence of any knowl-

edge on the part of Walpert of the plaintiff's belief that the mortgage was a note, or of her inability to read the documents she signed without pause or inquiry, it would be difficult to find any principle upon which the mortgage could be avoided by reason of the failure of Walpert to read or explain to her the meaning and effect of the mortgage deed. Whatever deceit or misrepresentation may have been practiced upon the plaintiff by others before her coming to Walpert's office was without his knowledge or participation, and can not be imputed to the association.

According to the plaintiff's proof, the defendant's agent gave her no false information either before or at the execution of the mortgage; yet the circumstances were such as to put even an illiterate person on notice that she was doing something more than executing a note; nevertheless she made no inquiry of Walpert or of those sitting and signing with her two sets of documents which were palpably unlike in form, content, and execution. The situation disclosed to her the necessity for investigation, and the means of information were at hand and obtainable by a simple inquiry or request that the instruments be read. Under such circumstances knowledge of a fact or of an instrument is imputed to a party, although unlettered, who would have acquired actual knowledge of the fact or of the instrument, if he had pursued the inquiries it was reasonable for him to make, and negligent, therefore, for him not to make. *Jones v. Smith,* 1 Hare, 43, 55; *Wilson v. Pritchett,* 99 Md. 583, 593; *Columbia Paper Bag Co. v. Carr,* 116 Md. 541, 551; *Standard Motor Co. v. Peltzer,* 147 Md. 509, 511; *Spitze v. Balto. & O. R. Co.,* 75 Md. 162, 171; *Shaffer v. Cowden,* 88 Md. 394, 400; *Smith v. Humphries,* 104 Md. 285, 290; *Boyle v. Rider,* 136 Md. 286, 291; *Blum v. Apetz,* 149 Md. 91, 100, 101; *Wicklein v. Kidd,* 149 Md. 412, 425.

Moreover, the evidence is convincing that the mortgage deed and the notes were read aloud in the presence of all the parties before they were deliberately signed, despite the denial of the plaintiff. The testimony of Mrs. Miller is characterized by uncertainty and indefiniteness, and she was

confessedly so inattentive to what was going on that much weight cannot be given to her statement that she did not hear anything said at the settlement about mortgages, although two of them were executed. The witness Highkin had so imperfect and contradictory a recollection of what took place that no great importance is to be attached to his statement that he did not hear anybody read the papers to the plaintiff, particularly when it is followed by an admission that Walpert did read the mortgages but that he cannot remember if plaintiff was there at the time. The defects of recollection in Highkin are supplied by Paper, who was another witness for the plaintiff. Paper testified that Highkin picked up the mortgages and all the papers and read them out loud for everybody and then Walpert asked if everybody understood, and when they replied that they did, all the papers were signed by Highkin, Paper, and plaintiff.

The evidence on the part of the plaintiff is insufficient to prove that Walpert either deceived her or made any misrepresentation to her which induced the plaintiff to execute the mortgage, or that she did not subscribe her signature to it with the intention that what preceded her signature should be taken as her act and deed. If the testimony for the defendant be considered, it will appear that plaintiff's statement that she had never agreed to mortgage her property is flatly contradicted by a committeeman who went to examine her premises to determine its sufficiency as security for the proposed loan and to learn if she were willing to give the contemplated mortgage lien thereon. This witness stated that he informed the plaintiff of his connection with the association and the purpose of his visit, and she told him she would execute a mortgage for $2,000 on her property as security for Highkin. In addition to this, Walpert's testimony is that the mortgage deed was read aloud by Highkin in the presence of all the parties, and that he explained to the parties what they were executing and took their acknowledgments.

It is true that Walpert's credibility is affected by the fact that, after these transactions, he has been convicted of the

crime of false pretenses, but while this conviction discredits him, it does not disqualify him nor make his testimony untrue. The conviction is, however, an important factor to be considered with all others in weighing the testimony of the convict. In this case, the witness had no motive for falsification and his testimony is so fortified by the circumstances and the corroboration of witnesses that the court regards his testimony as truthful and as accurate a statement of what actually happened as is now possible to obtain.

Discrepancies and conflict in the evidence offered by the respective parties are found on this record as on every one in which there is a disputed issue of fact, but their statement and discussion would not affect the court's conclusion on what it regards as the salient and decisive facts which were established by the weight of the evidence, so further analysis will not be made.

2. The remaining point is that the plaintiff and Paper were guarantors of the payment of the mortgage obligation, and that the plaintiff was discharged by the defendant because the mortgagee permitted the principal "mortgagor frequently to make payments smaller in amount than those set up by the terms of the original mortgage and permitted the said mortgagor to pay smaller sums on the expense account, dues and principal account and interest account, and on numerous occasions changed the terms of said mortgage by accepting payments other than those set out in the mortgage, and varied its terms without the knowledge or consent of" the plaintiff. This quotation is from the twelfth paragraph of the amended bill of complaint and the defendant answered and demurred to this paragraph. The answer was an admission that it had been indulgent to the mortgagor by accepting smaller amounts than were due and a denial that in so doing the guarantors were released. At the same time the court dismissed the bill on the evidence, it sustained the demurrer to this twelfth paragraph. *Hill v. Pinder,* 150 Md. 397, 405, 406.

The parties had taken all their testimony and the chancellor, at its close, had delivered an oral opinion, in which

he stated the bill of complaint would be dismissed, before the amended bill was filed. At the beginning of the opinion, the chancellor said that he would grant leave to the plaintiff to file her amended bill and the defendant to answer as of the day but prior to the opinion; and that his conclusion would be founded upon the assumption that the amended bill and answer had been filed. This was on February 13th, 1928, as that is the date of the filing of the amended bill, which was answered and its twelfth paragraph demurred to on February 14th, 1928, which was the day on which the decree was passed sustaining the demurrer and dismissing the bill. Although the twelfth paragraph raised a question which was not presented by the original bill, the evidence taken in the cause on the part of the plaintiff tended to show that the principal mortgagor did not make the payments at the times and in the amounts stipulated in the mortgage deed; and that these payments were largely in arrear when the foreclosure proceedings were begun. This evidence and those averments of the twelfth paragraph, except the one that the defendant "varied its (the mortgage's) terms without the knowledge or consent of your oratrix"—which is too general and indefinite a charge to be well pleaded—do not afford any basis for the relief sought, even if the charge of fraud which would avoid the instrument could be combined with the theory of the validity of the instrument and the discharge of a guarantor therefrom by an alteration of its terms.

The mortgage provided that "the said William Paper and Lillie Golden is joining herein solely for the purpose of guaranteeing the mortgage loan made to the said Samuel Highkin, and are liable hereunder only as guarantors to the said mortgage, and they hereby waive any notice of extension of time which may be made to the said mortgagor in his payments hereunder." So, an acceptance of less than was due, and a mere delay in foreclosing, are simply an indulgence to the principal debtor, and not an alteration of the terms of the instrument. There was no binding agreement for delay. Mere delay, or promise of delay, without consideration, is not sufficient to discharge the guarantor. *Booth*

v. *Irving National Bank,* 116 Md. 668, 675, 676; *Berman v. Elm Loan Assn.,* 114 Md. 191, 195, 196; *Lake v. Thomas,* 84 Md. 608, 623; *Freaner v. Yingling,* 37 Md. 491, 497, 509; *McShane & Rodgers v. Howard Bank,* 73 Md. 135, 155; *Gray v. Farmers' Bank,* 81 Md. 631, 643; *Warner v. Williams,* 93 Md. 517, 521; *Sasscer v. Young,* 6 G. & J. 248.

Finding no reversible error, the decree will be affirmed.

*Decree affirmed, with costs.*