WALTER J. MITCHELL ET AL., EXECUTORS,

*vs.*

MARY L. SLYE.

*Successive Appeals—Testamentary Capacity—Sufficiency of
Evidence—Testimony of Witness—Refreshing
Recollection.*

Where, in a proceeding to caveat a will, the legal sufficiency
of the evidence to support the caveator's prayers as to testamentary capacity could not be considered on appeal owing to
the absence of any special exception, the fact that the Court of
Appeals remanded the case for a new trial was not conclusive
as to the sufficiency of the evidence in that regard, for the
purpose of a second appeal.                                p. 422

That the appellants could, on a former trial, have filed special exceptions to certain prayers, and failed to do so, did not
preclude them from filing such exceptions on a second trial,
after reversal and remand by the Court of Appeals.      p. 422

That defendants offered no prayer for an instructed verdict
on the question of testamentary capacity did not preclude them
from raising the question, for the purpose of appeal, by special
exceptions to prayers.                                    p. 422

The presumption being in favor of testamentary capacity, a
caveatee need not ask an instruction directing a verdict in his
favor in this regard, in order that the question may be considered on his appeal.                                        p. 422

On an issue as to the validity of a will, executed by testator
during his last illness, while in a hospital, *held* that the testimony of a physician attached to the hospital, who attended
testator, and of his nurse, that owing to the poison absorbed
from his illness, and the administration of opiates, he was not
mentally capable of making a will, was sufficient to enable the
jury to find a verdict for the caveator.              pp. 423-427

A witness, a hospital nurse, could not testify as to the correctness of entries on a hospital chart in regard to the condition of her patient, if she had nothing to do with the making of the entries and could merely testify that the entries were correct if made by the attending physician, or if they appeared on the chart. pp. 419, 428

The exclusion of a question asked of a witness was not ground for reversal if the witness proceeded to answer it with the same degree of fullness as if the objection thereto had not been sustained. p. 430

*Decided June 25th, 1923.*

Appeal from the Court of Common Pleas of Baltimore City (DUFFY, J.).

Caveat proceedings by Mary L. Slye in reference to the will of Augustus B. Slye, deceased, in which will Walter J. Mitchell and W. Mitchell Digges were named executors. From rulings in favor of the caveator on issues from the Orphans' Court of Charles County, said executors appeal. Affirmed.

The first exception was to the striking out of the answer of Mrs. Ringgold, a hosptial nurse, as to whether an entry on the hospital record as to testator's condition on a certain day was a fair description of that condition, the answer being "If Dr. Hooper wrote it, it was."

The second exception was to the striking out of the answer of the same witness to a question as to whether an entry on the hospital chart to the effect that for more than twelve hours before a named hour on the day of the execution of the will, testator had had no morphine, was "an accurate statement of fact," her answer being "If it is on the chart, it is."

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, PATTISON, URNER, ADKINS, and OFFUTT, JJ.

*William L. Marbury* and *James Thomas,* with whom was *Albert S. J. Owens* on the brief, for the appellants.

*J. Wallace Bryan* and *George Arnold Frick,* with whom was *Albert M. Sproesser* on the brief, for the appellee.

BOYD, C. J., delivered the opinion of the Court.

This is an appeal from rulings made at a second trial of a caveat filed to the will of Augustus B. Slye, deceased. He executed the will in question on the 11th day of March, 1911, about ten or twelve days after he had undergone an operation for tubercular peritonitis, and died in the hospital on March 27, 1911. The will was admitted to probate by the Orphans' Court of Charles County, and shortly afterward a caveat was filed by Susan N. Slye, a niece of the testator. Nothing was done until 1917, and in the meantime Susan N. Slye, following a severe illness, was adjudicated mentally unsound and her mother, the appellee, was appointed her committee. In November, 1917, application was made to have issues of facts sent to a court of law, and issues were framed by the Orphans' Court as follows:

"First—Whether the paper writing was signed by said Augustus B. Slye, or by some other person in his presence and by his express direction, and attested and subscribed in the presence of two or more credible witnesses.

"Second—Whether the contents were read to or by him, and were known to him at or before the alleged execution thereof.

"Third—Whether it was procured by undue influence; and

"Fourth—Whether it was executed by him when he was of sound and disposing mind, and capable of executing a valid deed or contract."

The record was removed for trial to the Circuit Court for Anne Arundel County and a verdict was rendered on the

first issue of "Yes," and on the other three issues of "No." An appeal was taken to this Court—being reported in the name of *Mitchell* v. *Slye*, 137 Md. 89. Some of the rulings of the lower court on the admissibility of evidence were reversed and the cause remanded. After the first trial Susan N. Slye died, leaving her mother (the appellee), her only heir and next of kin. The case was removed for trial to the Court of Common Pleas of Baltimore City, and on the 18th of September, 1922, a verdict was rendered on the first, second and fourth issues for the plaintiff, and on the third issue for the defendants. From that verdict the executors appealed, after a motion for a new trial had been overruled. There are three exceptions to rulings on the admissibility of evidence, and the fourth presents the rulings on the prayers. The court granted five prayers offered by the plaintiff (appellee) and four offered by the defendants (appellants), including an instructed verdict for defendants on the third issue. The appellants excepted to the action of the court in granting the prayers of the plaintiff and filed special exceptions to the plaintiff's second, third, fourth and fifth prayers, on the ground that "no evidence had been adduced legally sufficient to entitle the jury to find that at the time of executing the said will Augustus B. Slye was not of sound and disposing mind, memory and understanding, and capable of making a valid deed or contract, or will." The special exceptions were overruled.

The principal question is raised by the special exceptions. There was no prayer offered by the appellants that there was no legally sufficient evidence that the testator was not of sound and disposing mind, etc., and that is only raised by the special exceptions. The appellee contends that the sufficiency of the testimony to sustain the present verdict was settled by the result of the first trial and appeal, and that the appellants cannot raise that question on this appeal. For that view they rely on *Carrington* v. *Basshor*, 119 Md. 378, *Cahill* v. *Baltimore*, 129 Md. 17, and similar cases, where it was

held that a party cannot be allowed to prosecute different and successive appeals on the same state of the record, unless there have been new proceedings since the former appeal. But we do not think they are applicable to this case. The appellants did not file special exceptions to the prayers offered at that trial, and rule 4 of the rules adopted by this Court, being section 9 of article 5 of the Code, after referring to other matters, distinctly says: "nor shall any question arise in the Court of Appeals as to the insufficiency of evidence to support any instruction actually granted, unless it appears that such question was distinctly made to and decided by the court below." As there was no special exception to the prayers presenting the question of testamentary capacity at the former trial, when this Court passed on the prayers and remanded the case it had no authority to pass on the legal sufficiency of such testimony. *Zell* v. *Dunaway*, 115 Md. 1; *Stewart Taxi-Service Co.* v. *Roy*, 127 Md. 70; 2 *Poe on Pl. and Pr.*, sec. 299, 299A. As this Court could not pass on that question, no inference can be drawn from the fact that it remanded the case, and it would carry the doctrine of the cases referred to above too far, in a case of this kind, to hold that as the defendants could have filed special exceptions to those prayers at that time, they cannot do so now. Moreover, there is some evidence which was offered at the last trial which was not introduced at the first trial.

Nor can we agree with the attorneys for the appellee that as the defendants offered no prayer below for an instructed verdict on this question, the special exceptions to these prayers are not sufficient to present the question. No authority is cited for that, and we cannot agree with the contention. The presumption is in favor of testamentary capacity and it is not necessary for a caveatee to ask such an instruction as suggested. The caveator had the burden on her, and if she produced no legally sufficient evidence of incapacity her caveat must fail as to that question. We must therefore, consider it.

At the first trial, as well as the one which has resulted in
this appeal, the deposition of Dr. Joseph W. Hooper was
used. It was taken at Wilmington, N. C., in October, 1919.
He graduated at the University of Maryland in June, 1909,
and became an assistant resident surgeon at the University
Hospital and occupied that position at the time the testator
was in that hospital—being also spoken of by one of the
witnesses as an interne. He attended the testator from the
time he entered the hospital until his death—spoke of it as
"from the latter part of February, 1911, when he came until
his death about the middle of March, 1911." The record
shows that the testator entered the hospital February 25,
1911, was operated on "a couple of days after his admission,"
and died March 27, 1911. Dr. Hooper testified that he was
in the James Walker Memorial Hospital, Wilmington, N. C.,
from April, 1912, to April, 1914, when he commenced private
practice, and continued until November, 1917, when he
entered the army. He was discharged from the army July
9, 1919, and shortly afterwards resumed his private practice
in Wilmington. It is thus seen that he had had, when his
deposition was taken, considerable experience. The doctor
testified that he saw the testator every day, always once and
most of the time three and four times daily from the time he
went into the hospital until his death, and that from the time
of the operation until his death he was not capable of making
a valid deed or last will and testament. In response to a
request to give his reasons in detail and as fully as he could,
in explanation of the above, he said: "Due to the toxin
or poison which he was continuously absorbing from his
tubercular condition of his intestines, the peritoneum, his
mind and body were considerably weakened and undermined.
Also from the time of his entrance to the hospital and espe-
cially after his operation, it was necessary to keep him con-
tinually under the influence of morphine to relieve his pain,
which was continuous and severe. These two factors—the
absorption of poison from his system and the morphine which

we had to give him at all times—had such a detrimental effect on his mental condition as to render him incapable of making a deed or will or testament."

Upon being asked again to give his reasons for stating in answer to a question whether he was mentally capable of executing a valid deed or last will and testament, that he was not, he said: "To the toxin which he was continually absorbing from the tubercular condition of his intestines, and due to the morphine which on March 11, 1911, had been increased to a larger amount than when he first entered the hospital, his mind was so undermined that he was incapable to make or comprehend a will or deed or testament."

He had previously stated that when the testator came into the hospital he was suffering from tubercular peritonitis and tubercular enteritis. He said on cross-examination that his answer was the result of his own recollection of the case, that the morphine was given under his orders, which he knew had been carried out, that he saw testator two to three times a day in the beginning and oftener as he approached the end. The cross-examination of this witness concluded as follows:

"Q. No. 10. Doctor, during the period that you speak of, was his strength of mind the same all the time, that is, was he weaker at times and then at other times his strength of mind in stronger condition? Ans. No; from the time of his admission to the hospital to the time of his death, he became rapidly weaker, both mentally and physically and never came back before the end was reached. Q. No. 11. Did you have occasion at any time to attempt to have a conversation with him regarding any business or property transaction? Ans. No. Q. No. 12. What degree of strength of mind is required in order that a man might be mentally able to make a will or deed? Ans. From a medical standpoint, when one is continually under the influence of morphine, which has a very deadening effect on the brain, especially that part of the brain which has to do with the thinking and mentality of the individual, especially when that same individual is absorbing

poison from the tubercular condition of his body, I don't think that that individual's mental condition is such that he is capable of making a will.  Q. No. 13. Does the effect of morphine vary as to different individuals?  Ans. Certain individuals have idiosyncrasies from morphine, consequently its action is different on different people.  Q. No. 14. Would you say, Doctor, that Mr. Slye did not have mind enough to realize that he owned property on the eleventh day of March, 1911?  Ans. Yes, he had mind enough to realize that he owned property on that date.  Q. No. 15. Did he have mind enough on that date, in your opinion, to understand anything about the transfer of the title of property from himself to others?  Ans. I do not think he did.  Q. No. 16. If it should appear from competent evidence that Mr. Slye, when the will in question was prepared and presented to him, directed the making of important changes in said will, would you then say that at such time he did not have the mental capacity to make a will?  Ans. Yes, I would unless I was there when these important changes were made.  Q. No. 17. But, assuming that they were made, what would your answer to the same question be?  Ans. Assuming that the statement made in your question is true, I would not say that he was mentally incompetent to make the will."

The deposition of Mrs. Nally R. Ringgold (formerly Miss Ridgeley) taken on the 15th of June, 1918, was offered in evidence at both trials.  She testified that in March, 1911, she was single, and her occupation that of an intermediate nurse at the University Hospital"; that she started to nurse the testator when he was brought from the operating room; that witness nursed him for about four (4) weeks and during the time gave him constant attention; could observe him all the time, and had the opportunity to observe his mental and physical condition."  She stated that in her opinion he was incapable of making a valid will or a valid deed or contract, and being called upon for her reasons, she said: "He was in pain all the time, and he had to be kept under the influence

of opium all the time"; that "he was not able to reason at any time." She said she was with him continuously with the exception of from three to five o'clock each afternoon until about ten days before he died, when a night nurse came on for the night work, and she was on duty in the day time from seven till seven. She said on cross-examination "that she thought him incapable of making a will from the first time she saw him up to the time of his death; that the extent of capacity she considered a person must have in order to make a will was that they should be of sound mind and able to comprehend and understand the making of a will; that she did not know what capacity the law requires in a person to make a valid deed or contract." Again it is stated in her testimony "that witness administered his medicine to him while nursing him, but could not say how much opium she gave him, in fact she did not know; that the course of treatment that was followed with him was a light diet and frequent hypdermics, but how much she did not know, and did not remember what the contents of the hypodermics were which he received, but did remember he was given morphia and strychnine but did not remember the frequency of the injections or the quantity or strength of the morphia, or of the frequency of its administration, and that at times the injections were morphia and strychnine, and that at other times she did not remember what they were."

A supplementary deposition of Mrs. Ringgold was taken on the 8th of September, 1922, which was offered at the last trial. She was asked to state why she said in her former deposition that he was unable to reason and replied: "Due to his extreme weak condition, the effects of the opiates which were administered to him frequently, and his apparent subnormal condition. Now Mr. Slye would frequently ask for nourishment; before I could leave his room he would frequently ring his bell and ask why I had been so long. At other times he seemed to have no recollection of having asked for nourishment when brought by request."

She said he did not seem to be able to concentrate; frequently when she spoke to him he would doze off without answering, apparently not having heard; was under the influence of opiates, "apparently all the time," that opiates were administered "about every three hours, and more often if necessary." Mrs. Ringgold seemed to be an intelligent woman, and, while she was an intermediate nurse when she nursed Mr. Slye, she had graduated and had considerable experience before her depositions were taken. No exceptions were taken by the appellants to any questions asked her in reference to her opinion—the only exception appearing when she was on the stand being as to rulings as to certain statements in the hospital chart which we will refer to later. There are no exceptions in the record as to the competency of the two principal witnesses for the plaintiff, the doctor and the nurse, to give their opinions. They were both, so far as the record discloses, unprejudiced and without personal interest in the result. Although it is greatly to be regretted that so many wills are set aside by verdicts of juries, usually it is for them to determine questions of fact. We cannot say that there was anything in what was said in *Crockett* v. *Davis,* 81 Md. 134, which would have authorized the lower court to reject these prayers by reason of the special exceptions filed. Nor do the cases of *Jones* v. *Collins,* 94 Md. 403; *Gesell* v. *Baugher,* 100 Md. 677; *Baugher* v. *Gesell,* 103 Md. 450; *Horner* v. *Buckingham,* 103 Md. 556, cited by appellants, sustain their position to the extent claimed.

Accepting those cases as our guides, we would be going beyond what they authorize, if the court held that the testimony given by the doctor and the nurse who had such good opportunities to know the actual condition of the testator during the period covered from the time of the operation until some time after the will was executed—indeed up to the time of his death—was not legally sufficient to enable the jury to find the verdict they did. It was not mere expert

testimony, based on an assumption of facts submitted to them, but it was from knowledge of the condition of the testator they found by coming into actual and constant contact with him. There were before the jury a number of witnesses who testified to facts which might have led the trial judge to a different conclusion from that reached by the jury, if he had been selected to try the facts, but in order to hold that the evidence of the doctor and the nurse was not legally sufficient to entitle the jury to find as they did, it seems to us that we would in effect be placing limitations on their powers in such cases greater than heretofore allowed under our practice. And when in addition to the evidence of those witnesses we consider that of others called by the appellee, it would seem to be useless in many cases to occupy the time of courts in the trial of caveats, if at the conclusion of them the court is authorized to settle the question of testamentary capacity by such a ruling as asked for, notwithstanding such evidence as is produced in this case.

We are of the opinion that there was no error in the ruling on the special exceptions. We do not understand that there was any objection urged to those prayers except those raised by the special exceptions. The attorneys for the appellants seem to have understood from the admissions and stipulations made that it was admitted that the will was duly executed and was duly admitted to probate, but that does not seem to be material in view of our conclusion as to the special exceptions referred to.

Having reached the conclusions we did in reference to them, it is not necessary to discuss the other exceptions at any length. We can have no doubt about the correctness of the rulings presented by the first and second bills of exception, and hence the evidence in them could not properly have been used in considering the questions presented by the special exceptions. As will be seen later, the jury did have before them the notations on the hospital charts referred to in the first and second exceptions.

The question ruled out in the third bill of exceptions was clearly properly done. Dr. Messick was on the stand and had testified that the latter part of February, 1911, he had been called upon to diagnose Mr. Slye's trouble and advised an operation. He had turned him over to Dr. Spruill, who had since died. Dr. Spruill performed the operation and assumed charge of the case and Dr. Messick was present at the operation and saw Mr. Slye "practically daily from the 27th of February, 1911, until the 24th of March, 1911." He testified very positively that upon his various visits Mr. Slye was absolutely of sound and disposing mind, memory and understanding, and capable of making a valid deed or contract. After testifying to having seen Mr. Slye's hospital chart during the previous trial of the case at Annapolis and stating that he remembered the notations appearing on the chart in Dr. Hooper's handwriting, he testified to one dated March 4, 1911, which is the same as that stated in the first bill of exceptions, and then testified as to another of March 20, which is the same as that in the second bill of exceptions. That testimony was not stricken out, but remained before the jury. Dr. Messick had said that he recognized on the chart the handwriting of Dr. Hooper and of Mrs. Ringgold, with both of which he was familiar, and had read over the chart at the time, but gave more attention to the notations appearing on it, and then gave the notations, which he said were in Dr. Hooper's handwriting. One of them was dated a week before and the other nine days after this will was made, but for whatever they were worth, the defendants got the benefit of them before the jury, as they were read by Dr. Messick when on the stand. By way of explanation, it is proper to say here that it had been testified to that the chart had been mislaid in some way since the first trial, and Dr. Messick had copied the notations he then found on the chart. This question was asked Dr. Messick: "Q. Now, Doctor, it is testified in this case that the will of Augustus B. Slye was made on the 11th day of March, 1911. I will ask you whether or not

in your opinion Augustus B. Slye, on that day, was of sound and disposing mind, memory and understanding, and capable of making a valid deed or contract?"

That was objected to and ruled out by the lower court, which ruling is presented by the third bill of exceptions. Immediately following that ruling, this appears as a part of Dr. Messick's testimony: That he could not positively say whether he did or did not see Mr. Augustus B. Slye on the 11th of March, 1911; that he did see him practically every day from the time of his entry to the hospital until March 24. When asked the question, "When you saw Mr. Slye was he, in your opinion, of sound and disposing mind, and capable of making a valid deed or contract?" witness answered, "I never saw Mr. Slye in my life that he was not of sound and disposing mind except once, and then he was under the anaesthetic at the operation." That on this occasion the doctors had put him to sleep, and that witness had never seen Mr. Slye in any kind of stupor, in any manner, to indicate he had been affected by drugs, except at the time when he was under the influence of anaesthetics.

It is perfectly clear that the defendants got all the benefit from the question stated in the third bill of exceptions that they could possibly have had if the objection had not been sustained. Indeed, what the doctor did say was all he could have said in answer to the question, as he clearly shows.

As we find no reversible error in any of the rulings we must affirm them.

*Rulings affirmed.*