ROBERT S. MEAD *v.* MARTHA M. GILBERT ET AL.

[No. 42, April Term, 1936.]

594 ·

*Decided June 10th, 1936.*

The cause was argued before BOND, C. J., URNER, OF-FUTT, PARKE, SLOAN, MITCHELL, SHEHAN, and JOHNSON, JJ.

*John B. Gray* and *Ridgely P. Melvin*, with whom were

*George B. Woelfel* and *John B. Gray & Son* on the brief, for the appellants.

*Robert Moss,* for the appellees.

OFFUTT, J., delivered the opinion of the Court.

Annie Mead, late of North Beach Park, Anne Arundel county, died testate on September 8th, 1932, leaving to survive her five children, Martha M. Gilbert, born Mead, May Belle Gay, born Mead, Harry E., Charles J., and Robert S. Mead. Prior to her death she executed a deed dated August 25th, 1931, which was recorded on August 28th, 1931, by which she conveyed to Michael J. Lane and Bertha E. Lane, his wife, a tract of land improved by a cottage which she used as her summer home at North Beach Park. The acknowledgment of that deed was taken by Z. Elizabeth Fitzgerald, a notary public, who certified that "on this 25th day of August 191— before the subscriber a Notary Public in and for the State of Maryland, personally appeared Annie Mead *and wife* and did acknowledge the aforegoing deed to be her act. In Testimony Whereof, I have affixed my official seal this 25th day of August A. D. 191—." On August 31st, 1931, by deed bearing that date, recorded September 2nd, 1931, Lane and his wife conveyed the same property to Robert S. Mead and Annie Mead as joint tenants. The granting clause of that deed described the property granted in these words (in part): "Those pieces or parcels of ground, situate, lying, and being, in Anne Arundel County, State of Maryland, being the same land which the said parties of the first part Michael J. Lane and Bertha E. Lane obtained from Annie Mead by deed dated the ——— day of August 1931, recorded in the Land Records of ——— in Liber ——— at folio ———."

In November, 1933, the other surviving children of Mrs. Mead filed the bill in this case against their brother, Robert S. Mead, individually and as executor of his mother's estate, for the purpose of having the two deeds to which reference has been made annulled, on the

ground that the deed from Mrs. Mead was procured by fraud at a time when she was mentally incompetent to execute it, and that the deed from the Lanes was merely an incident of a single fraudulent scheme. The defendant answered, denied the fraud, a replication was filed, testimony was taken before an examiner, the case heard, and on February 15th, 1936, the court signed a decree annulling both deeds. From that order Robert S. Mead, defendant below, took this appeal. .

The testimony is not all conflicting. There are some facts which are either admitted or undisputed, and they will be stated first.

It does not definitely appear how old Mrs. Mead was at the time of her death, but it does appear that she was between seventy and eighty years of age, and that at the time of her death her oldest living child was about forty-four years old. On June 24th, 1902, she executed a will at Hampton, Virginia, in which she distributed her estate equally among her children, and in that will, Henry E. Mead, her husband, and Robert S. Mead, purport to be named executors. Robert at that time was about fourteen or fifteen years old, and in the probated will it appears that his name was written in the will in the place of another name which was there originally, but which had been erased. There was no explanation of the substitution, nor any identification of the hand by which the substitution was written. It was proved by Robert S. and Henry E. Mead, who made affidavit only to the genuineness of Mrs. Mead's signature.

She appeared to be on excellent terms with all of her children. From time to time she helped each of them financially; in the winter she lived in an apartment which Robert Mead, her son, occupied, apparently with his brother Charles, and in the summer she lived either at her cottage at North Beach Park or visited her daughters, who were married and had homes of their own, one in New Jersey, the other in the City of Washington. When she occupied her cottage, Robert appears to have lived with her, and when he left the apartment for his mother's

cottage, the wife of Charles would move into it and live there with him.

Notwithstanding her generosity to her children, Mrs. Mead retained some property, and especially the house and lot at North Beach Park, which is the subject of this suit.

Her health began to fail some time prior to her death; in August, 1931, she became very ill, and on the 26th day of that month she was removed to the Sibley Hospital in Washington, where she was attended by Dr. A. Magruder McDonald. On the day before she went to the hospital, she was in bed, seemed to be very weak, and apparently in great pain. On that day her son came to her room, accompanied by a notary public, Mrs. Z. Elizabeth Fitzgerald, who was also a real estate operator, and, in the course of that visit, she executed the deed to Lane and his wife. The notary said that she, Mrs. Mead, produced the deed and that her son, Robert, held her up in bed while she signed it. The second deed from the Lanes to Mrs. Mead and Robert as joint tenants was not executed at that time, and Mrs. Fitzgerald, although she took the acknowledgment of the grantors named in it, testified that she had no recollection of having seen that deed or having taken the acknowledgments of it.

When the deed to the Lanes was executed, Mrs. May Belle Gay was staying in the cottage with her mother, and there were present also Mrs. Gay's small son and a nephew. When Robert arrived with the notary, he requested Mrs. Gay "to keep the children on the back porch as there was a little business that man had to transact," so that neither she nor the children were present while the deed was executed.

The controverted issues of fact are: (1) Whether at the time she executed the deed to the Lanes Mrs. Mead was mentally competent to execute a valid deed or contract; (2) whether her son Robert stood in a confidential relation to her at that time; and (3) whether her execution of that instrument was procured by fraud.

It is not disputed that Mrs. Mead was at that time very ill, although there is a decided conflict in the medical testimony as to the nature of her illness. Dr. Grafton D. P. Bailey, who had attended her for three years, said that she was suffering from cancer of the bladder and vagina, Bright's disease, and uremia, and that eventually she died from uremic coma. He had attended her shortly before August 25th, 1931, but on that day he happened to be away, and she was so ill that Dr. G. P. Ward was called in to see her. Apart from stating that when he saw her Mrs. Mead "had abdominal pathology ailment," whatever that may mean, Dr. Ward expressed no very clear opinion as to what was the nature of the disease from which she suffered when he saw her. He did, however, state with assurance that when he saw her she "was capable of transacting any business as much as she had been in any of her previous five years," although he admitted that he had never seen her in those five years nor indeed at all prior to that day.

Dr. A. Magruder McDonald attended her when she reached the hospital. He found, he said, no evidence of cancer, but it also appears from his testimony that he did not look for any. His testimony as to what actually was found is somewhat confusing, as will appear from this extract from it: "In the course of her stay in the hospital we had certain laboratory work done and X-ray in that laboratory. * * * The X-ray report showed that there was apparently some obstruction in the small bowel, and that there was a chronic appendicitis and no obstruction in the small bowel. The laboratory work on her blood was absolutely normal in all phases in the blood chemistry." He found no uremia. In his direct examination he was asked to express an opinion as to Mrs. Mead's mental condition on August 25th, on the hypothesis that her condition then was the same as when he examined her. But since there was no evidence in the case to support that hypothesis, the objection to the question should have been sustained. He further said that when he examined her he saw nothing unusual in her mental condition.

Herman E. Burgess, a neighbor, said that whenever he saw Mrs. Mead she "had her own mind," that she talked "just the same as any one else talked," but he was not sure that he saw her on the day she executed the deed.

Margaret V. Sinyard, also a neighbor, who saw her after her return from the hospital, said that she "seemed to be perfectly rational."

Robert Lee Tucker, who managed a local grocery store, said that he had seen Mrs. Mead before she went to the hospital, he could not say precisely when, but not "very long," and that then "she seemed as good as ever she was" to him, "her mind was all right." These three witnesses also said that she had told them that she wanted her son Robert to have her property at the "Park."

Dr. Bailey was recalled in rebuttal, and after having described her condition was asked: "Based on this condition and the testimony which you have read this morning of the people who saw her on that day, do you or do you not consider on that day her capable of making a valid deed or contract?" An objection to that question was overruled, and witness answered: "From the testimony of one or more witnesses previously taken I would say that she was not capable of making a valid deed or executing any instrument that would normally require the proper intelligence." A motion to strike out the answer was overruled. The question was improper and the objection should have been sustained. The testimony on which he was asked to base an opinion was conflicting; it included opinions and hypotheses; the witness was not required to assume the truth of the testimony, or the existance of any particular facts. *Quimby v. Greenhawk*, 166 Md. 335, 171 A. 59; *Calder v. Levi*, 168 Md. 260, 177 A 392. He did, however, testify that she was uremic during the period of his attention to her and that that condition stunted the normal brain function. An objection to that testimony was properly overruled, since, as her attending physician, he was qualified to express an opinion as to any condition which he discovered as a result of

his examination. *Donnelly v. Donnelly*, 156 Md. 81, 84, 143 A. 648.

Mrs. Fitzgerald testified that on the afternoon of the day when Mrs. Mead executed the deed to the Lanes, Robert Mead called for her and she went with him to his mother; that she found Mrs. Mead lying on a day bed, clad only in a dressing gown; that when the witness asked her how she felt, she said that she was feeling "pretty bad," and produced the deed which she had with her on the day bed. She said that Mrs. Mead was capable of executing such an instrument, and also said that Mrs. Mead told her that she had been trying for a long time to have the papers executed, that she wanted Robert to have the property because he had stayed with her. The witness said that neither Lane, nor any one else, accompanied her and Robert to the Mead home, and she was corroborated in that by Robert, but both May Belle Gay and her nephew Robert L. Gilbert testified that a man did accompany them to the house, and Robert identified the man as Lane. Lane, although present during the taking the testimony, was not called and did not testify. Mrs. Fitzgerald's testimony is weakened by the extraordinary fact that although she recalled in the most meticulous detail what occurred when she took Mrs. Mead's acknowledgment of the deed to the Lanes, she had not the slightest recollection of ever having taken the acknowledgment of the Lanes of their deed to Robert and Mrs. Mead, and had no recollection whatever of any such deed, although she admitted that she certified the acknowledgment.

Robert L. Gilbert, a grandson, then fifteen years old, said that when he saw his grandmother on the day she signed the deed she was moaning; that she did not talk to him except to say good morning; that he thought she was dying. He further said that when Robert and Lane came, his uncle Robert found him on the back porch and said: "I thought I told you kids to get to hell out of here and he put us out and locked the door."

Mrs. May Belle Gay was permitted without objection

to testify that when the deed was signed her mother's condition was "very bad"; that she "was very sick and complained about being in agony with pains"; that she did not improve during the day; that she was in such agony that she "just kept crying with pain."

Mrs. Martha L. Gilbert testified, also without objection, that she saw her mother the morning after she arrived at the hospital. That then her condition was "too bad to talk to her"; that she gave no sign of recognizing the witness; that she stayed two weeks at the hospital; that for three days her condition was very bad; that after that, while "she did not exactly improve, it just seemed her mind cleared a little, she knew us when we went in, but very little talking she did." When she left the hospital she stayed with Mrs. Gilbert four or five weeks, and then "Robert Mead from the Beach came up and got her and took her down; she was not able to travel, she should not have left, she was in no condition, took her down to North Beach." She also testified that: "For her business part, Robert Mead took over all her business; he had charge of her business ever since she lived at the Beach; he did everything that was needed to be done, none of us ever did anything about it. * * * "You testified a little while back that your mother's business affairs were handled by your brother, do you still say that is a fact in view of your present statement that you do not know whether your brother Robert received these rentals or whether paid direct to your mother? A. It may have come in mother's name. I know if any houses to sell, she would always wait home and wait for his advice before doing anything. "As a matter of fact your mother had a great deal of confidence in your brother Robert? A. Always had, yes."

Charles J. Mead, a son, who also saw her on August 25th, 1931, said: "She was suffering from pain? A. Enough for me to go to a doctor. I ran eighteen miles for a doctor. Second time I have ever seen her that way. "Did she go to the hospital the next morning? A. Dr. Bailey had been attending to her right along. Dr. Ward

said she had appendicitis and would have to go to the hospital right away. * * * Did she talk to you? A. She kissed me and said 'How are you, Son?'"

Dr. J. Percy Wade, a specialist in mental diseases, called as an expert, after having stated that he had read the medical testimony in the case, was asked: "What is your opinion, after reading their testimony, and considering all the circumstances of the case, as to the capacity of Mrs. Mead, the decedent, to make a valid deed or contract, on the day she made the deed in this case, and give your reasons in full?" An objection to that question should have been sustained, for the reasons stated above in dealing with a question asked Dr. Bailey, and also because it asked the witness not only to express an opinion as to Mrs. Mead's mental condition, but also to exercise a power committed to the court alone, that of resolving the conflict in that testimony. *Quimby v. Greenhawk, supra.* He was then asked: In your experience does uremic condition affect the mentality? and answered, "It frequently affects the mentality, loss of memory, they are stupid and depressed frequently." An objection to that question was properly overruled, since as an expert on mental disease he was qualified to describe the effect of the physical condition, ascribed to Mrs. Mead by Dr. Bailey, upon the mental processes of a person in her condition.

Dr. Ward, who attended Mrs. Mead on August 25th and 26th, 1931, gave testimony which in some measure was in conflict with that of the other witnesses as to her condition on those days. He said in part: "She was very interesting to talk to, on questioning her about her past history she was very free in giving it, normally free, a woman between seventy-five and eighty, her memory was good, she could relate different instances of her medical life very clearly, her attitude was very co-operative, she wanted to get well like the average patient we have. She talked quite a bit about her children and what a pleasure they had been to her. In other words I saw no abnormality, nothing that would make me suspicious,

or anything other than a normal mental condition." And on cross-examination he added: "You talked with Mrs. Mead? A. Yes. Where did you find her, was she in bed? A. Yes. Stretched out in the bed? A. Lying in the bed. Had you ever seen her before in your life? A. I don't recall. She talked to you? A. Yes. And very pleasant? A. Yes. With temperature and with this pain? A. Not very high temperature.

"And with this pain she talked to you and told you the details of her life? A. Yes."

It also appeared that it was Robert who summoned Dr. Ward, and that when his mother was away he kept her papers in a container in his safe.

Excluding all testimony inadmissible under Code, art. 35, sec. 3, it cannot be said that this evidence was sufficient to show that when Mrs. Mead conveyed her North Beach Park property to the Lanes she lacked the mental capacity to execute a valid deed or contract. There is no affirmative testimony that she did not have that capacity, while there is positive testimony that she did. Mere physical distress, debility, or pain, are not in themselves sufficient to support an inference of mental incapacity, unless they are so severe and are of such a character as to justify a reasonable conclusion that they so impaired the mind of the person whose act is under consideration that he was unable to comprehend its nature and natural consequences and to act with judgment and understanding in respect to it. The physical condition of a grantor in a deed, or a testator in a will, as the case may be, is never material or relevant unless it appears by competent evidence that the physical condition did in fact affect the mental condition of the grantor or testator. *Donnelly v. Donnelly, supra; Higgins v. Carlton,* 28 Md. 115; *Birchett v. Smith,* 150 Md. 369, 376, 133 A. 117; *Underhill on Wills,* sec. 138, 139; *Alexander on Wills,* sec. 342; 68 *C. J.* 443. The mere fact that the grantor was at the time she executed the deed extremely weak and in great pain, in the absence of any evidence to show that that condition affected her mental capacity, was not suf-

ficient to overcome the presumption that when she executed it she possessed sufficient mental capacity to make a valid and binding contract. 68 *C. J.* 445; *Colburn v. Ellers,* 160 Md. 104, 153 A. 14; *Scheller v. Schindel,* 153 Md. 547, 138 A. 415; *Bell v. Wolfkill,* 152 Md. 407, 137 A. 35; *Mecutchen v. Gigous,* 150 Md. 79, 132 A. 425; *Mitchell v. Slye,* 143 Md. 418, 122 A. 555; *Dreyer v. Welch,* 136 Md. 219, 110 A. 476; *Smith v. Shuppner,* 125 Md. 409, 93 A. 514; *Lyon v. Townsend,* 124 Md. 163, 91 A. 704; *Gesell v. Baugher,* 100 Md. 677, 60 A. 481; *Brown v. Ward,* 53 Md. 376, 36 Am. Rep. 422; *Higgins v. Carlton,* 28 Md. 115.

The second question of fact is whether Robert stood in a confidential relation to his mother. Mrs. Gilbert testified without objection that he took over all of his mother's business "ever since she lived at the Beach"; he had charge of her business; he did everything that needed to be done; Robert himself did not contradict that statement, but Mrs. Fitzgerald said that she had rented the cottage for Mrs. Mead and checked over the rents with her from time to time, although she added that when she wanted to deliver a message to Mrs. Mead, she called up Robert, as there was no telephone at the cottage. When she was absent on visits to her daughters her papers were left in Robert's custody. She lived with him. At the time she executed the deeds she was suffering from a fatal and incurable disease which must have to some extent at least made it necessary for her to rely upon some one for assistance in transacting such business as she had, and she had no one but Robert upon whom to rely and she had a great deal of confidence in him. There is no definite statement of her age to be found in the record, but Dr. McDonald said that she was in her seventies, and Dr. Ward who said that he had her history from her testified that she was between seventy-five and eighty years of age.

These facts are sufficient to establish a confidential relationship between Robert and his mother. In *Beinbrink v. Fox,* 121 Md. 102, 104, 88 A. 106, the court said: "It

is firmly established as the law of this state that, where an aged parent makes a conveyance to a child, the burden is cast upon the grantee of establishing the fairness of the transaction. And, if where confidence is reposed it is abused, courts of equity will grant relief. *Highberger v. Stiffler,* 21 Md. 352; *Todd v. Grove,* 33 Md. 188; *Whitridge v. Whitridge,* 76 Md. 54, 24 A. 645; *Zimmerman v. Bitner,* 79 Md. 115, 28 A. 820; *Berger v. Bullock,* 85 Md. 441, 37 A. 368; *Reck's Excr. v. Reck,* 110 Md. 497, 73 A. 144." While that expression was used in connection with the facts then before the court, and is not of course to be understood as meaning that mere age without reference to any other fact is in itself sufficient to justify an inference that the relation exists, the question was further considered in *Upman v. Thomey,* 145 Md. 347, 358, 125 A. 860, and the court, after an examination of the authorities, reached the conclusion that age in itself was but a fact to be considered in connection with other facts affecting the question. Pomeroy in his work on *Equity Jurisprudence* (4th Ed.) sec. 962, beginning at page 2077, ending at page 2080, said: "Where the positions of the two parties are reversed, where the parent is aged, infirm, or otherwise in a condition of dependence upon his own child, and the child occupies a corresponding relation of authority, conveyances conferring benefit upon the child may be set aside. Cases of this kind plainly turn upon the exercise of actual undue influence, and not upon any presumption of invalidity; a gift from parent to child is certainly not presumed to be invalid." *Williams v. Williams* 63 Md. 371; *Whitridge v. Whitridge,* 76 Md. 54, 24 A. 645; *Shields v. Burge,* 171 Ky. 149, 188 S.W. 321 (mother, aged seventy-five, adult child aged fifty-seven; burden to prove fairness on latter); *Reed v. Reed,* 101 Md. 138, 60 A. 621 (gift from mother to son; confidential relation being established, burden is on son); *Kennedy v. McCann,* 101 Md. 643, 61 A. 625; *Horner v. Bell,* 102 Md. 435, 62 A. 736 (gift to daughter standing in actual fiduciary relation); *Thiede v. Startzman,* 113 Md. 278, 77 A. 666 (fiduciary relation existed,

and burden on grantee) ; *Reck's Excr. v. Reck,* 110 Md. 497, 73 A. 144 (burden placed on grantee) ; *Henry v. Leech,* 123 Md. 436, 91 A. 694. The question comes finally to this, that where a conveyance from a parent to a child is attacked, the existence of a confidential relationship between the parties is a fact to be shown, as in any other case where it is not presumed as a matter of law (*Upman v. Thomey, supra*), and that in such an inquiry advanced age, physical debility, and mental feebleness are all facts, no one of which is necessarily conclusive, but any one of which may have weight in determining whether the relationship as a fact existed.

Accepting those principles, the facts stated above are sufficient to establish a confidential relation between Robert and his mother. That conclusion brings up the third question, whether the deed was procured by fraud. Fraud is a generic term and includes constructive fraud as well as actual fraud. In this case, because of the relationship of the parties, the transaction was constructively fraudulent and, apart from any question of actual fraud, will not be permitted to stand unless the beneficiary shows that it was the free, voluntary act of the donor and that her confidence was not abused. *Pomeroy, Eq. Jur.* sec. 956.

In dealing with that inquiry, various facts may be considered, such as the physical and mental condition of the grantor, secrecy attending the transaction, the absence of opportunity for disinterested advice, and indeed any circumstance which reflects upon the influence of the relation in procuring the grant.

There is no contention in this case that the conveyance to the Lanes was anything but a step in transferring the property to Robert and his mother as joint tenants, so that at her death, if he survived her, he would take the whole title, and it is conceded that to that extent the grant was a gift to Robert. The burden was therefore upon him to explain it, to show that it was free and voluntary and was not the result of any abuse of the confidence which his mother reposed in him. Not only did he

fail to meet that burden, but the circumstances attending the transaction are not wholly free from a suspicion of actual fraud.

His mother was at the time extremely ill, so ill, in fact that he held her up in bed while she signed it. Her condition was such that her grandson, a boy of fifteen years old, thought she was dying. She was in great pain, and complained about being "in agony with pains." Not only had she no independent advice, but Robert saw to it that his sister, who was in the house, and his two nephews, who were also there, were not in the room during the transaction, nor was there any one present except Mrs. Mead, himself, the notary, and possibly Lane. He and the notary said that Lane was not present, the grandson said that he was, and Mrs. Gay said that some man other than Robert was there. Lane himself could have cleared up the doubt, but, although he was available, he did not testify. Although the deed was to the Lanes, they did not reconvey the property until August 31st, 1931, six days later, and there is nothing in the record to indicate that she ever saw or knew of the second deed, and the notary who took the acknowledgment of the Lanes to that deed did not remember ever having seen or heard of it. Nothing was said by Robert of the transaction to his brothers or sisters; they, knew nothing of it, nor did it appear that there was any publication from which they could have learned of it, and it is open to doubt whether Mrs. Mead knew that she was conveying her property to strangers at the time she signed it, for, had she known that, it is at least probable that she would have insisted that they immediately reconvey it to her. Moreover, his own testimony as to his mother's will, which was found in his custody after her death, lacked candor. When cross-examined as to the fact that his name as executor was apparently added to the will after its execution, he testified in part as follows: "Q. And you were named as executor in the will? A. I could not tell you, except what was in the will, that's the way the will reads, my father and myself. Q. Look at that will and tell me whose name was

rubbed out and whose name written in? A. I don't know. Q. Did you call the Orphans' Court's attention to it when you brought it in? A. It was not necessary for me to do that. Q. Do you say you became executor of the will when you were three years old? A. If the will says so. Q. Do you see there that your name was written in and some one's else rubbed out? A. Yes, and all the rest saw it at the time I produced the will. Q. Where did you find the will? A. I found the will in this little container my mother had. Q. You had never seen the will? A. No, I had not and no one else had ever seen it so far as I know. Q. You say that is your mother's writing? A. I don't know, it may be and it may not be. Q. You see the name of some one was rubbed out? A. Yes, some one wrote the name Robert S. Mead in there, but it is not my writing. Q. * * * Legally speaking, if you were not named in the will according to the laws of Maryland, you are not the legal executor. A. I may have been over five years old. Q. You don't contend she named you as executor of her will when a child thirteen years of age? A. I don't know. Q. Don't you believe there was a name there and another name put in there after that first one was erased? A. No. Q. Do you think so? A. I would not commit myself."

Mrs Fitzgerald testified that Mrs. Mead had the deed which she signed on the bed with her. Mrs. Gay, who straightened the room up before Robert arrived and made her mother's bed, saw nothing of a deed, and Robert Gilbert, who had also been in the room, saw no deed, and did not think his grandmother could have read it if it had been there, and it seems unlikely that one in her physical condition was capable of the exertion of getting it even if it was in her custody. Lane, who must have known something of the deed which he and his wife executed, as well as the deed to them from Mrs. Mead, was not called as a witness, although as mayor of the town he must have been available. It does appear that Mrs. Mead said to her grocer, to the notary, and to casual neighbors, that she intended that Robert should have the property because the others had married and left her, but Robert

had stayed with her. But even if she had had such an intention, it does not follow that she was willing to convey her home to strangers with no assurance that it would be reconveyed so as to effect that purpose. There could have been no such assurance, for the strangers held the title until it became apparent that her illness was not likely to be immediately fatal. Moreover, while she lived with Robert, she also assisted him financially, and part of the time they lived in her home, and she spent much of her time with her married daughters.

Another fact entitled to consideration is that Mrs. Mead herself did not attack the transaction, but, in view of her physical condition at the time it was consummated, and from then on to her death, it lacks the weight it would have had if she had been in better health, or if at the time she had had disinterested advice, and was properly informed of the nature and effect of her act. There was no such evidence. Mrs. Fitzgerald said that she asked Mrs. Mead if she was familiar with the deed (from her to the Lanes), and when she answered that she was, she, the notary, then took her acknowledgment. The deed was not read to or by Mrs. Mead in her presence, nor was there any reference to the deed from the Lanes.

Upon those facts, excluding all testimony to which the defendant excepted, and excluding all testimony given by parties to the cause as to any conversations or transactions had with Mrs. Mead, it cannot be fairly said that the appellant met the burden of showing that the gift to him was the free and voluntary act of the donor and not the result of an abuse of the confidence which she reposed in him. 21 *C. J.* 113; *Upman v. Thomey,* 145 Md. 347, 125 A. 860; *Bauer v. Bauer,* 82 Md. 241, 33 A. 643; *Thiede v. Startzman,* 113 Md. 278, 287, 77 A. 666, and cases there cited.

It follows that both the deed from Mrs. Mead to the Lanes and from them to her must be annulled. Such a conclusion is always unfortunate, because it involves the possibility that it may also annul the real intention of the donor, and because it is the policy of the law to pro-

tect and execute such formal and solemn expressions of intention as are manifested by deeds and other like instruments. It is, however, equally important and equally a policy of the law to protect those who are forced, by illness, ignorance, weakness, or other conditions beyond their control, to repose confidence in others against any abuse of that confidence. And it is always in the power of one who takes a benefit from another to whom he stands in a confidential relation to have the transaction consummated under such circumstances that, if its validity is questioned, it can be shown to be fair and righteous, or at least to explain why such evidence is not furnished.

The decree appealed from will therefore be affirmed.

*Decree affirmed, with costs.*

URNER, J., filed a memorandum as follows, in which BOND, C. J., concurred.

I concur in the opinion except in regard to its expressions upon the subject of actual fraud, which in my judgment subject the defendant to an imputation not required for the purposes of the decision nor sufficiently supported by the evidence.