CROMWELL *v.* SHARON BUILDING & LOAN ASSOCIATION, INC. ET AL.

[No. 272, September Term, 1958.]

318

*Decided June 26, 1959.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND, PRESCOTT and HORNEY, JJ.

*O. Bowie Duckett* for the appellant.

*R. Lewis Bainder* for the corporate appellee.
No brief and no appearance for Oscar Brilliant, appellee.

PRESCOTT, J., delivered the opinion of the Court.

Ida Cromwell, an elderly and illiterate Negro woman, her two daughters and eight grandchildren decided, in 1956, to place new shingles on the roof of her small home and to make certain repairs to the porch. It turned out to be a fateful and unfortunate undertaking for them. Ida contracted with a company, Home Modernizers, now out of business, to do the work. The shingles on the roof were to cost $695; the repairs to the porch $1125. In order to pay for the same, two loans were made, both being financed by the Baltimore Federal Savings and Loan Association (Baltimore Federal). Neither the record nor the briefs make clear the details of the financing, but Ida and her daughters gave a promissory note to Home Modernizers for the sum of $1523.18, dated August 20, 1956, which was discounted by Baltimore Federal, with recourse against the Home Modernizers. Merhle Sacks, the operator of Home Modernizers, approached Albert F. Reisfeld, an attorney, a real estate operator, and the owner of the Strand Company, which he operated as a brokerage concern, in regard to obtaining a loan to be secured by mortgage on the Cromwell property in order to pay off the note held by Baltimore Federal. The Strand Company got a commitment from

the appellee, Sharon Building & Loan Association, Inc., (Sharon), to make such a loan in the amount of $1650, and obtained from Ida Cromwell, a written agreement to pay Strand 5% of the loan as a brokerage fee and guaranty fee for guaranteeing the payment of $400 of the loan. Sharon was represented at the settlement by William Reisfeld, an attorney, who was the father of Albert Reisfeld, the owner of the Strand Company. Two men, probably Merhle Sacks and a helper, picked up Ida Cromwell and took her to the office of William Reisfeld to effectuate a settlement.

Ida testified she had never seen the men before; she had no idea why she was going to Baltimore; she signed two papers without knowing what they were or why she was signing them; she could not read them and she did not ask that they be read or explained to her. On the contrary, William Reisfeld, in his deposition, stated that the papers were fully explained to her before she signed them.

At the settlement on September 8, 1956, Sharon gave its check for the sum of $1650 to Ida, who, in turn, indorsed the same. William Reisfeld deposited the check in his account and made disbursement. He disbursed $82.50 to Strand Company in accordance with Ida's agreement with that company, $47.50 as an entrance fee, $15 as a president's fee and $15 as an inspection fee to Sharon; and, after payment of other costs and taxes, he paid the balance of $1315.05 to Baltimore Federal in payment of the note held by it. There was a small additional amount due Baltimore Federal to make payment in full, which was absorbed by Home Modernizers.

The mortgage given by Ida to Sharon was payable in monthly installments, which were made until the middle of 1957 when she became in arrears and foreclosure proceedings were filed, but, upon her raising and paying $200, were discontinued. The monthly payments were resumed and continued until February, 1958, when, again, they halted, due this time to the fact, as stated by Ida, she had "runned out of money."

Foreclosure proceedings were again instituted and this time carried to a conclusion. After the sale, the appellant here filed exceptions to its ratification, which were overruled and the

sale finally ratified and confirmed, no appeal being taken from that order.

The appendix fails to show what was a reasonable and proper charge for repairing the roof and the porch, but the chancellor does state, in colloquy with counsel, that Home Modernizers "has done her out of a lot of money."

This is an original suit, entirely independent of the foreclosure proceedings above mentioned, to annul and set aside the mortgage on the grounds that its execution was induced by misrepresentation, fraud, undue influence and mistake.

The appellant urges that an equity court should vacate this "unfair and unconscionable mortgage where one of the parties is incapable of understanding its contents.[1]" It is, of course, true that under proper circumstances equity courts will annul instruments because of the unfair and unconscionable methods used in obtaining their execution. In the case at bar, the plaintiff has failed to show any word or action of the *appellee* that was unfair or unconscionable. If there were such conduct, it was by others than the appellee, insofar as disclosed by the record. Relief has been prayed on the ground that the mortgage was obtained through "fraud, undue influence and mistake"; yet, when the testimony was taken, it disclosed none of the three. The appellant's incredible version of the execution of the mortgage was that she was asked by two unknown men to go to Baltimore to sign some papers; she consented and went there, where she signed two papers (she actually signed, at least, four); that she did not know what she was signing, or why, and had no idea as to what the papers related; and that she could not read, no one read them to her and she did not request that they be read. It is difficult to conclude that she was entirely frank and fair with the court when she gave this statement; she did not testify explicitly to any fraud, undue influence, misrepresentation or deceit on the part of the appellee or any of its agents. The situation at the

---

1. We lay aside the procedural aspect of the case. It will be noted that the mortgage has been foreclosed and the sale ratified after exceptions thereto were overruled. No appeal was taken from the order of ratification. We are now requested to "annul and set aside the mortgage."

time of the execution of the mortgage disclosed to her the necessity of inquiry and investigation if she did not understand the nature and details of the business at hand. The information was available and obtainable by a simple inquiry or a request that the instruments be read. Under circumstances of this nature, knowledge of a fact, or the context of an instrument, is imputed to a party, although lacking in education and business affairs, who would have acquired actual knowledge of the fact or of the contents of the instrument, if she had made the inquiries that it was reasonable for her to have made, and, therefore, negligent for her not to have made. *Golden v. Kovner Bldg. & Loan Ass'n,* 156 Md. 167, 173, 143 A. 708.

We come now to the question of the mental capacity of the appellant. She does not claim that she lacked mental capacity by being bereft of reason due to lunacy or insanity, but that due to ignorance she failed to have sufficient mental capacity to "understand the terms of the mortgage." There have been many cases in Maryland wherein this Court has been requested to cancel deeds due to the mental incapacity of the grantor. Quite naturally, in some cases they have been set aside, and, in others they have not. A reading of these cases establishes a rather simple rule. Literacy is not a prerequisite for the owner of land to have full dispositive power thereover. The necessary mental capacity of the grantor in a deed is that he be able to understand and comprehend its nature and natural consequences, the property with which it deals, and to act with judgment and understanding in respect to it. And the crucial time concerning such capacity is the time of the execution of the deed. *Mead v. Gilbert,* 170 Md. 592, 603, 185 A. 668; *Wise v. Swartzwelder,* 54 Md. 292; *Marmaduke v. Dyer,* 208 Md. 525, 119 A. 2d 367; *Masius v. Wilson,* 213 Md. 259, 264, 131 A. 2d 484. Cf. 59 C.J.S., *Mortgages,* Sec. 139.

As stated above, there is no claim of insanity on the part of the appellant. The only testimony offered which related to her mental capacity was that she did not finish the first grade in school. The law does not attempt to designate the amount of education required to execute a valid deed or contract, but has educed the rule stated above with reference to

the requisite mental capacity. The law presumes that one who executes a deed is possessed of sufficient mental capacity to make a valid and binding contract, *Mead v. Gilbert, supra,* 170 Md. at page 604, and the burden to overcome this presumption is upon the one who claims to the contrary, *Gordon v. Rawles,* 201 Md. 503, 512, 513, 94 A. 2d 465. Upon the record as it is presented to us, we are constrained to hold, as the chancellor apparently did, that the appellant failed in meeting this burden, which means that, at least for the purposes of this case, the appellant had sufficient mental capacity at the time she executed the mortgage to make a valid deed or contract. The rule is well established that a competent person cannot impeach his own deed unless its execution was induced by fraud or duress, or mistake made under circumstances sufficient to charge the grantee with knowledge thereof, which good faith required him to disclose to the grantor. *Gross v. Stone,* 173 Md. 653, 664, 197 A. 137. No fraud, duress or mistake has been shown on the record in this case. As a matter of fact, the appellee parted with the full amount of the consideration for which the mortgage was given except certain "fees" charged by it, which were not shown to be exorbitant by any affirmative evidence to that effect.

We shall consume little space in considering the contention that a confidential relationship existed between the appellant and the attorney for the appellee. It was not shown that she had ever seen him before her visit to Baltimore when she signed the mortgage; that she reposed any special trust or confidence in him; that he, in any manner dominated her actions; that she was justified, under the circumstances of this case, in assuming that he would act in a manner entirely consistent with her welfare; or that she reposed any confidence in him that resulted in the substitution of his judgment for hers in any material matters involved in the transaction. We therefore, conclude that no legal confidential relationship existed between the appellant and the appellee's lawyer. *Bass v. Smith,* 189 Md. 461, 469, 56 A. 2d 800; *Owings v. Currier,* 186 Md. 590, 603, 47 A. 2d 743; *Upman v. Thomey,* 145 Md. 347, 358, 125 A. 744; *Zimmerman v. Hull,* 155 Md. 230, 240, 141 A. 531; 15 C.J.S., *Confidential,* pp. 821, 822, 823.

It is quite difficult to state with clarity and precision exactly what the last contention of the appellant is. Apparently, she claims that the bylaws of the appellee provide that every member shall pay an entrance fee not in excess of two dollars per share, but the appellant was charged $47.50 for 17 shares, or $13.50 too much; that she was charged "illegal" inspection and president's fees of $15.00 each; and that an "unconscionable" broker's fee of $82.50 was allowed. No portion of the bylaws is printed in the appellant's appendix; consequently, we are not called upon to pass upon the propriety of the alleged $13.50 overcharge. Rule 828 b 1(b); *McBurnie v. McBurnie,* 214 Md. 210, 134 A. 2d 78. While the appellant claims the inspection and president's fees of $15.00 each were illegal, she fails to point out wherein the chancellor was clearly erroneous (Rule 886 a). The record fails to disclose what either fee was for, other than there were charges made therefor (by the names "Pres. Fee" and "Inspection Fee") on the settlement sheet. Under these circumstances, we are not called upon to presume what they were for and that they were illegal. The $82.50 "brokerage fee" was shown to have been the result of a contract directly between the appellant and the broker, Strand Co. It also involved a guarantee by the broker of the payment of some $400 of the principal of the mortgage. No evidence was offered in an attempt to show this was an unreasonable or unconscionable charge; and, assuming it to be unreasonable, no ground is advanced to show that this would invalidate the appellee's mortgage. There was no showing of any relationship between Strand and Sharon, other than a business one. The brokerage and guaranty fee was paid by the appellee as the result of the appellant's contract made directly wth the broker; the appellee parting, as stated above, with all of the consideration for which the mortgage was given, except the fees allowed to it.

Finding no error in the rulings of the chancellor, the decree will be affirmed.

*Decree affirmed, with costs.*